2012 UT 32

**David Vincent GREGG, Appellant,**

v.

**STATE of Utah, Appellee.**

**Nos. 20090255, 20090567.**

Supreme Court of Utah.

June 1, 2012.

---

Jennifer K. Gowans, Park City, for appellant.

Ryan D. Tenney, Salt Lake City, for appellee.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 Petitioner David Vincent Gregg appeals the dismissal of his petition for post-conviction relief. The district court dismissed Mr. Gregg's claims as procedurally barred under the Post–Conviction Remedies Act (PCRA). We hold that Mr. Gregg qualifies for an exception to the procedural bar because he received ineffective assistance of trial and appellate counsel. Therefore, we vacate his conviction and remand for new trial.

## BACKGROUND

¶ 2 On July 18, 2003, David Vincent Gregg was convicted of rape, a first-degree felony. The trial court sentenced him to an indeterminate sentence of five years to life. Mr. Gregg has served nearly nine years in the Utah State Prison, where he is currently incarcerated. This matter is before us on appeal from the district court's summary judgment order dismissing Mr. Gregg's amended petition for post-conviction relief. Because this case comes before us after a jury verdict, "we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues

raised on appeal." *State v. Bluff,* 2002 UT 66, ¶ 2, 52 P.3d 1210 (internal quotation marks omitted).

¶ 3 Mr. Gregg was tried by jury in July 2003. At trial, both parties agreed that the only contested issue was whether the alleged victim, Ms. S., consented to sexual intercourse with Mr. Gregg. At sentencing, the trial court also acknowledged that "[t]he only issue before the court and before the jury was the question of consent," and noted that "[t]his was a highly difficult issue."

¶ 4 Seven months earlier, in January 2003, Mr. Gregg and Ms. S. met online and had begun corresponding through an online dating service, LDSSinglesOnline.com (LDSSO). A few weeks later on February 15, 2003, Mr. Gregg and Ms. S. began chatting on LDSSO shortly after midnight. After chatting online with Mr. Gregg, Ms. S. gave him her phone number and the two talked on the phone for the first time. Around 2:00 a.m., Ms. S. invited Mr. Gregg to her apartment. Just before Mr. Gregg arrived, Ms. S. called her friend Matt and asked him to call her in one hour. Ms. S. testified that she asked Matt to call her because she was concerned that Mr. Gregg, whom she had never met before, was coming over late at night. Mr. Gregg arrived at her home at 2:20 a.m.

¶ 5 After Mr. Gregg arrived, he and Ms. S. talked and then engaged in consensual kissing and sexual foreplay. They were interrupted when Matt called at 3:20 a.m. Ms. S. answered Matt's call and pretended the call was from a girlfriend. After ending the call, Ms. S. told Mr. Gregg that a girlfriend was coming over because she was having problems with her boyfriend. In reality, Matt had indicated that he would drive up to Ms. S.'s apartment in Bountiful once his girlfriend Jess got off of work in Draper. At this point, Mr. Gregg's and Ms. S.'s description of events diverge.

¶ 6 According to Ms. S.'s testimony, once she ended the call with Matt, she and Mr. Gregg resumed kissing. She testified that she stopped and told Mr. Gregg that she was uncomfortable because they had just met. Mr. Gregg asked her if they could continue with sexual activity for another five minutes and promised they would not have intercourse. Ms. S. testified that she told Mr. Gregg "no" several times before he suddenly grabbed her ankles and began to rape her. She testified that shortly thereafter, Matt called again, interrupting intercourse.

¶ 7 Mr. Gregg's version of events is quite different.[1] According to Mr. Gregg, after Ms. S. received the phone call at 3:20 a.m., they resumed kissing, which progressed to consensual foreplay. They paused for a brief conversation about how far they wanted sexual activity to progress. Ms. S. agreed to continue, and Mr. Gregg agreed that they would stop whenever she wanted. They resumed consensual sexual activity, which gradually escalated to the point of intercourse. According to Mr. Gregg, Ms. S. did not say "no" or stop foreplay after their conversation about boundaries. Rather, Ms. S. asked Mr. Gregg to turn off the lights and helped him pull off her pants before the two began consensual intercourse.

¶ 8 Both Mr. Gregg and Ms. S. agree about the events after this point. Matt's phone call interrupted intercourse. Ms. S. answered the phone and asked Matt and his girlfriend to wait outside a few minutes before coming to the front door. Police records indicate that this phone call occurred at 4:07 a.m. With Matt and Jess waiting outside, Mr. Gregg and Ms. S. got dressed. Then Ms. S. answered the door, invited Matt and his girlfriend into her apartment, and introduced the couple to Mr. Gregg. Matt and Jess stayed in the apartment while Ms. S. walked Mr. Gregg to his car, hugged him, gave him a kiss, and said goodnight.

¶ 9 At trial, Ms. S. testified that once she got back to her apartment, she began to cry. She told Matt and Jess what had happened, and they urged her to go to the hospital or call the police. She resisted, saying that she was fine and that she was responsible for not stopping things with Mr. Gregg sooner. Matt called a rape crisis line, suggesting that Ms. S. had been assaulted. The crisis line told Matt that if Ms. S. went to the hospital,

---

1. Although Mr. Gregg did not testify at trial, his account of events was presented to the jury through the introduction of a videotaped interrogation and a recorded pretext phone call.

they would file a report, but she would not have to press charges. Ms. S. was still resistant until she called another friend of hers, Sean, whom she had dated and met on LDSSO. Sean was able to convince her to go to the hospital to get the morning-after pill to prevent a potential pregnancy.

¶ 10 While at the hospital, the examining nurse brought Ms. S. to a room to wait for a doctor. The nurse then returned with a rape victim advocate and a detective. Ms. S. was hesitant to talk to them because she did not feel that it was necessary. In her own words, Ms. S. testified that she "didn't know—[there were] so many feelings going through my mind and I wanted to make sure what I was feeling was valid ... But I'm not sure, you know, if what I'm feeling is just my imagination." At this time, Ms. S. had never claimed she was raped in her conversations with Matt, Jess, Sean, or the examining nurse.

¶ 11 The rape victim advocate and the detective encouraged Ms. S. to tell them about her encounter with Mr. Gregg, suggesting that she could use a fake name so that no one would be implicated. Ms. S. finally acquiesced and described the events of the previous evening. After Ms. S. told them about her encounter with Mr. Gregg, she testified that the rape victim advocate and the detective "told [her] that they ha[d] never heard of someone that was more manipulative, and that what happened was a date rape. And [Mr. Gregg was] a person who plays mind games." At that point, Ms. S. decided to press charges against Mr. Gregg.

¶ 12 Six months later, after a two-day trial, the jury convicted Mr. Gregg of one count of rape, a first-degree felony. After trial and before sentencing, Mr. Gregg fired trial counsel based on counsel's "serious errors" at trial. Mr. Gregg filed a pro se motion to arrest the judgment, which the trial court denied. At that same hearing, the trial court sentenced Mr. Gregg to an indeterminate term of five years to life.

¶ 13 Mr. Gregg retained appellate counsel, who appealed the district court's denial of the motion to arrest the judgment and filed a rule 23B remand motion with the Utah Court of Appeals.[2] The court of appeals denied the motion and affirmed the conviction. We denied Mr. Gregg's petition for certiorari.

¶ 14 Mr. Gregg then obtained new counsel and filed a petition for post-conviction relief. The district court dismissed this petition, but the Davis County Attorney's office stipulated that Mr. Gregg could amend his original petition. Mr. Gregg did so. In his amended petition, Mr. Gregg made eleven arguments alleging ineffective assistance of trial and appellate counsel.[3] The Davis County Attorney's office filed a motion for summary judgment and the district court granted the motion, dismissing all of Mr. Gregg's claims as procedurally barred under the PCRA. Mr. Gregg then filed the instant appeal. We have jurisdiction under section 78A–3–102(3)(i) of the Utah Code.

### STANDARD OF REVIEW

¶ 15 "We review an appeal from an order dismissing or denying a petition for

2. A rule 23B remand allows an appellate court to remand a case to the trial court for further evidentiary hearings when a criminal defendant has alleged ineffective assistance of counsel, but the record is insufficient to determine whether there is an ineffective assistance claim. The rule provides that "[a] party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a).

3. Specifically, he argued that he had received ineffective assistance of trial and appellate counsel through (1) the admission of improper prejudicial pseudo-expert hearsay testimony, (2) admission of improper bolstering hearsay testi-mony, (3) trial counsel's failure to object to this hearsay testimony, (4) appellate counsel's failure to raise trial counsel's ineffectiveness on this issue, (5) failure to object to the reckless mens rea jury instruction, (6) failure to object to the prosecutor's misstatements of evidence during closing, (7) failure to investigate and present evidence regarding Ms. S.'s LDSSO e-mails after the alleged rape, (8) failure to present evidence that there was a 47–minute period of consensual sexual activity immediately prior to intercourse, (9) failure to present evidence of the pretext calls that showed Ms. S.'s consent, (10) failure to present a key witness, and (11) appellate counsel's failure to marshal the evidence on appeal.

post-conviction relief for correctness without deference to the lower court's conclusions of law." *Taylor v. State*, 2012 UT 5, ¶ 8, 270 P.3d 471 (internal quotation marks omitted).

## ANALYSIS

### I. MR. GREGG'S AMENDED PETITION FOR POST–CONVICTION RELIEF IS A FIRST PETITION RATHER THAN A SUCCESSIVE PETITION

■ ¶ 16 The State argues for the first time on appeal that Mr. Gregg's amended petition for post-conviction relief should be treated as a successive petition and urges us to dismiss his petition on that basis alone. The State argues that it was procedurally improper for the Davis County Attorney to stipulate to Mr. Gregg's amended petition because the State Attorney General's office is the only party who can permit an extension under rule 65C(i) of the Utah Rules of Civil Procedure. Thus, the State argues that Mr. Gregg's petition should be dismissed as an improper successive petition. We disagree.

¶ 17 Rule 65C(i) governs service of petitions for post-conviction relief and requires that the court direct the clerk of the court to "serve a copy of the petition, attachments and memorandum by mail upon the respondent." UTAH R. CIV. P. 65C(i). The rule notes that where "the petition is a challenge to a felony conviction or sentence, the respondent is the state of Utah represented by the Attorney General." *Id.* Thus, rule 65C(i) directs the court clerk to serve PCRA petitions on the proper respondent. In this case, the clerk mailed Mr. Gregg's petition for post-conviction relief to the Davis County Attorney rather than the Utah State Attorney General. And rather than forwarding the petition to the State Attorney General, the Davis County Attorney filed a motion for

summary judgment and then stipulated that Mr. Gregg could amend his original petition. We will not hold Mr. Gregg accountable for a procedural error on behalf of the clerk of the court or for the county attorney's failure to forward the petition. Because of these errors, it was reasonable for Mr. Gregg to believe that the Davis County Attorney had authority to stipulate to the filing of his amended petition. Therefore, we will treat Mr. Gregg's petition as a first amended petition and address the merits of his claims.

### II. MR. GREGG RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 18 The PCRA "establishes a substantive legal remedy for any person who challenges a conviction or sentence for a criminal offense and who has exhausted all other legal remedies, including a direct appeal." UTAH CODE § 78–35a–102(1) (2007).[4] The Act includes a legal remedy for a petitioner who received ineffective assistance of counsel. *Id.* §§ 78–35a–104(1)(d), –106(2). To succeed on an ineffective assistance of counsel claim in a post-conviction petition for relief, the petitioner must prove that he received ineffective assistance from both his trial counsel and his appellate counsel. *See id.* § 78–35a–106(2); *Lafferty v. State*, 2007 UT 73, ¶ 44, 175 P.3d 530.

■ ¶ 19 The Sixth Amendment to the U.S. Constitution guarantees criminal defendants a right to effective assistance of counsel. U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684–87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[5] We evaluate whether a defendant has received ineffective assistance of counsel under the two-part test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "First, the defendant must show that counsel's performance was deficient.... Sec-

---

4. The PCRA was amended in 2008 to renumber the Act and replace the phrase "a substantive legal remedy" with "the sole remedy." *Compare* UTAH CODE § 78–35a–102(1) (2007), *with id.* § 78B–9–102(1) (2008). Because Mr. Gregg filed his petition for post-conviction relief in 2007, we apply the statute as it read in 2007.

5. Mr. Gregg alleges he received ineffective assistance of counsel both under the Sixth Amendment to the U.S. Constitution and under article I,

section 12 of the Utah Constitution. Because Mr. Gregg "does not ... provide any separate argument or authority for the proposition that the guarantees to counsel under the Utah Constitution differ from the guarantees to counsel under the United States Constitution," we "choose to consider only the claim based on the federal Constitution." *State v. Templin*, 805 P.2d 182, 185 (Utah 1990).

ond, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. We hold that Mr. Gregg received ineffective assistance of both trial counsel and appellate counsel.

### A. Mr. Gregg Received Ineffective Assistance of Trial Counsel

¶ 20 To meet the first part of *Strickland,* the defendant must demonstrate that "counsel's performance was so deficient as to fall below an objective standard of reasonableness." *Myers v. State,* 2004 UT 31, ¶ 20, 94 P.3d 211 (citing *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052) (internal quotation marks omitted). Generally, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

¶ 21 Under the second part of *Strickland,* "the defendant must show that [counsel's] deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Prejudice is shown where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. We have noted that "[i]n making this determination, an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *State v. Templin,* 805 P.2d 182, 187 (Utah 1990) (citing *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052).

¶ 22 Mr. Gregg has met his burden under *Strickland.* We hold that it was ineffective assistance of trial counsel to fail to investigate and present evidence of (1) Ms. S.'s LDSSO e-mail correspondence after the alleged rape and (2) the 47–minute period of

consensual sexual activity immediately before the alleged attack.[6]

### 1. Ms. S.'s LDSSO E-mails

¶ 23 Mr. Gregg argues that it was ineffective assistance of trial counsel to fail to investigate facts that would have undermined the credibility of the victim, who was the only witness that provided direct evidence of his guilt. Specifically, Mr. Gregg argues that his trial counsel failed to investigate Ms. S.'s LDSSO e-mails, which would have revealed that Ms. S. contacted other men and sent four cheerful, light-hearted e-mails through LDSSO only two days after the alleged rape. Mr. Gregg claims that this evidence would have affected the outcome at trial because it would have severely undermined Ms. S.'s credibility. In particular, the e-mails would have undermined Ms. S.'s testimony that she only logged on to LDSSO after the alleged rape to aid the police investigation, and the e-mails would have undermined her credibility regarding the severe anxiety and panic attacks she claimed to suffer as a result of the incident. We agree that it was ineffective assistance of counsel to fail to investigate and present this evidence to the jury.

¶ 24 Trial counsel's failure to conduct a reasonable investigation into the underlying facts of a case constitutes deficient performance under the first *Strickland* prong. In *State v. Templin,* we vacated a conviction of rape and remanded for new trial where the defendant's trial counsel failed to investigate facts that would have contradicted the victim's testimony. *Id.* at 188–89. We noted that when "counsel does not adequately investigate the underlying facts of a case, . . . counsel's performance cannot fall within the 'wide range of reasonable professional assistance'" because "a decision not to investigate cannot be considered a tactical decision." *Id.* at 188 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

¶ 25 Similarly, trial counsel's failure to investigate Ms. S.'s LDSSO e-mails constituted

---

6. Mr. Gregg's first amended petition raised eleven claims. Because we hold that Mr. Gregg received ineffective assistance of trial and appellate counsel with respect to two of these claims, we decline to address Mr. Gregg's remaining arguments. *See Alliant Techsystems, Inc. v. Salt*

*Lake Cnty. Bd. of Equalization,* 2012 UT 4, ¶ 27 n. 41, 270 P.3d 441 ("[C]ourts should generally resolve cases on the narrowest applicable grounds unless specific reasons exist for offering broader guidance." (alteration in original) (internal quotation marks omitted)).

deficient performance. Trial counsel was aware that Ms. S. logged on to the dating website at least seventeen times after the alleged rape, but counsel failed to investigate the contents of her online interaction. The specific content of Ms. S.'s LDSSO e-mails was critical to Mr. Gregg's defense because Mr. Gregg and Ms. S. met on LDSSO, the two chatted on that same dating service immediately before the alleged attack, and the e-mails revealed crucial details about Ms. S.'s state of mind after the alleged rape. Yet trial counsel did not attempt to investigate or subpoena Ms. S.'s LDSSO e-mail records in the six months leading to trial, even though he easily could have done so. In fact, Mr. Gregg subpoenaed the records himself after he fired trial counsel because of his counsel's "serious errors" and "failure to present key facts" at trial. Had trial counsel investigated Ms. S.'s correspondence on LDSSO, he would have discovered that Ms. S. actually sent light-hearted e-mails to four different men through LDSSO only two days after she claimed she was raped by Mr. Gregg. Trial counsel's decision not to investigate this evidence fell outside the range of reasonable professional assistance under the first prong of *Strickland*.

■ ¶ 26 Under the second *Strickland* prong, Mr. Gregg must show prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. We have held that when trial counsel fails to reasonably investigate and present evidence that was crucial to the defense, it amounts to prejudice when this evidence would have "affect[ed] the 'entire evidentiary picture.'" *Templin*, 805 P.2d at 188 (quoting *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052). To determine the overall effect of such evidence, we have instructed appellate courts to "consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Id.* at 187.

For instance, in *Templin* we noted that the prospective witness's testimony was important because "it reflect[ed] upon the credibility of [the alleged victim]." *Id.* at 188. We held that the alleged victim's credibility was particularly important "because [her] testimony [was] the only direct evidence of Templin's guilt," and the failure to investigate a prospective witness amounted to prejudice because that witness's testimony would have affected "the entire evidentiary picture." *Id.* (internal quotation marks omitted).

¶ 27 The second *Strickland* prong has been met here. The LDSSO e-mails would have severely undermined Ms. S.'s credibility, which would have affected the entire evidentiary picture because her testimony was the only direct evidence of Mr. Gregg's guilt. At trial, Ms. S. testified that she only logged on to LDSSO after her encounter with Mr. Gregg to aid the police in their investigation. But in reality, only two days after the alleged rape, Ms. S. sent four e-mails to various men through LDSSO, giving them her private e-mail address and encouraging them to contact her. One e-mail read:

> Hey Coz!
>
> I just wanted to let you know that I am not going to renew my membership ..[.] it expires today. So, I think that you still have my number and email address and I would love to keep in touch. :) Hope all is going well! :) Talk to you soon!
>
> [Ms. S.] [7]

This evidence would have undermined Ms. S.'s credibility because it directly conflicted with her testimony that she only logged on to LDSSO after the rape to help the police investigation. And the e-mails demonstrating her cheerful demeanor also would have conflicted with her story that she was so distraught after her encounter with Mr. Gregg that she suffered an anxiety attack and swore off the LDSSO dating service altogether. [8]

---

7. The content of the other three e-mails is substantially similar. For instance, another e-mail reads:

"Hi Brian! Hey, I just wanted to let you know that I am not renewing my membership..[.] it expires today. I have enjoyed getting to know you and if you would like to drop me a line, please do so at my regular email address at [e-mail address]@[provider].com. I hope all is well in your world! Take Care! :) [Ms. S.]"

8. At trial, Ms. S. testified that she had a history of depression and anxiety attacks. In fact, she claimed that she experienced an anxiety attack

¶ 28 Had Mr. Gregg's trial counsel presented these e-mails, the jury would have been able to fully assess Ms. S.'s credibility. And Ms. S.'s e-mails would have undermined the entirety of her testimony because they would have demonstrated that she sent four light-hearted e-mails to various men through LDSSO only two days after she claimed to have been raped by a man whom she had met on that same website. Her cheerful demeanor also would have undermined her credibility regarding the severe anxiety she claimed to have suffered after her attack. And the e-mails would have directly refuted her claim that she swore off the dating service and only accessed her LDSSO account to further the police investigation.

¶ 29 The State contends that Ms. S.'s LDSSO activity was sufficiently addressed at trial because Mr. Gregg's trial counsel presented Ms. S.'s unauthenticated LDSSO logon history. But Mr. Gregg's trial counsel never investigated or presented Ms. S.'s e-mails at trial. And the specific content of Ms. S.'s LDSSO e-mails was essential to determining her credibility, given that they provided insight into Ms. S.'s state of mind after the alleged rape. Furthermore, the e-mails would have directly rebutted Ms. S.'s claim that she accessed her LDSSO account only to further the police investigation.

¶ 30 As we noted in *Templin*, it is unreasonable for trial counsel to fail to investigate critical facts relevant to the victim's credibility, especially in a case such as this one where the only direct evidence of the defendant's guilt was from the testimony of the alleged victim. *Id.* Ms. S.'s LDSSO e-mails would have affected the entire evidentiary picture at trial because Ms. S.'s testimony was the only direct evidence of her lack of consent, which was key to Mr. Gregg's guilt or innocence. There was no independent physical evidence that supported or contradicted Ms. S.'s testimony, and therefore, the conviction is not strongly supported by the record. And "although it is undisputed that a person can be convicted of rape solely on the testi-

mony of the victim," we have nevertheless held that where the conviction is not strongly supported by the record and trial counsel fails to investigate and present evidence impacting the victim's credibility, *Strickland* is met. *Id.* at 188–89. This evidence affected the overall evidentiary picture and is sufficient to undermine our confidence in the trial's outcome. Therefore, we hold that Mr. Gregg was prejudiced by his trial counsel's deficient performance under *Strickland.*

2. The 47–Minute Window

■ ¶ 31 Mr. Gregg argues that his trial counsel also failed to present evidence as to the timing of events that would have undermined Ms. S.'s credibility, called into question her account of the alleged attack, and would have corroborated Mr. Gregg's story that the two engaged in consensual intercourse after nearly an hour of sexual foreplay. We agree that trial counsel's failure to investigate and present this evidence to the jury constituted ineffective assistance of counsel.

¶ 32 To meet the first part of *Strickland,* Mr. Gregg must demonstrate that "counsel's performance was so deficient as to fall below an objective standard of reasonableness." *Myers,* 2004 UT 31, ¶ 20, 94 P.3d 211 (citing *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052) (internal quotation marks omitted). In *Templin,* we held that it was deficient performance of trial counsel to fail to investigate facts that would have undermined the victim's credibility and her story regarding the alleged rape, especially when that evidence tended to corroborate the defendant's story. 805 P.2d at 187–88. We determined that this was deficient performance because the attorney failed to investigate a prospective witness even though the defendant had provided the name of the witness to the attorney prior to trial. *Id.*

¶ 33 Similarly, in this case, Mr. Gregg's trial counsel was aware of the 47–minute time period prior to trial. It was clear from

---

immediately after Mr. Gregg left her house the morning of February 15. Ms. S. also indicated that after her encounter with Mr. Gregg, she did not renew her subscription with LDSSO, and she swore off the dating service. And when defense counsel pointed out that she had logged onto LDSSO seventeen times after February 15, Ms. S. claimed that she only accessed LDSSO "to pull the defendant's profile for police."

the police report that there was a 47–minute window of time between the two phone calls during which the rape allegedly occurred. This directly conflicted with Ms. S.'s story that the rape occurred in a matter of minutes. Yet Mr. Gregg's trial counsel failed to investigate that time period even though it would have undermined Ms. S.'s overall credibility and her testimony regarding the rape. And trial counsel's failure to investigate this evidence was particularly troubling given that the 47–minute window would have corroborated Mr. Gregg's account that he and Ms. S. engaged in consensual intercourse after nearly an hour of sexual foreplay. This deficiency is especially egregious given that Mr. Gregg's guilt or innocence rested on the issue of consent.

¶ 34 The record reveals that Mr. Gregg's trial counsel never attempted to introduce the police report into evidence, and the State never moved to exclude it. The record also indicates that trial counsel never attempted to further investigate the timing of the phone calls. Trial counsel never subpoenaed Matt's phone records. And at trial, Mr. Gregg's counsel did not even attempt to elicit testimony from Matt that would have clarified when he placed the calls. This is particularly troubling given that the little testimony that Matt did provide regarding the timing of his phone calls appeared implausible.[9] As we noted in *Templin,* it can never be a tactical decision to fail to investigate and introduce evidence that would undermine the credibility of the only witness who presented direct evidence of the defendant's guilt. *Id.* at 188. In a case where consent is the only contested issue at trial, this detail was essential in determining whether Mr. Gregg's or Ms. S.'s account more accurately portrayed what occurred, especially because this detail would have further undermined Ms. S.'s overall credibility.

¶ 35 The State argues that the essence of this evidence was presented to the jury and Mr. Gregg's trial counsel merely failed to

emphasize the 47–minute time frame. And the State contends that trial counsel cannot be found ineffective for points of emphasis. But the police report was neither presented at trial nor submitted to the jury. And Mr. Gregg's trial counsel failed to produce any evidence of the 47–minute period. His trial counsel made only one vague reference to a 45–minute time period during closing argument, and that reference was completely unsupported by any evidence presented at trial. Thus, Mr. Gregg's trial counsel performed deficiently by failing to investigate and present this evidence to the jury, despite its obvious presence in the police report.

■ ¶ 36 Mr. Gregg has also demonstrated prejudice under the second *Strickland* prong. In *Templin,* the defendant was convicted of rape after a trial where the only disputed issue was consent. *Id.* at 183–84. On appeal, we held that it was ineffective assistance of trial counsel to fail to contact and interview a prospective witness who "would have testified that she saw [the] defendant and the [alleged] victim kissing passionately for over fifteen minutes ... within an hour of the rape reported by the victim." *Id.* at 188–89. We noted that this evidence was critical because the witness's testimony, "reflect[ed] upon the credibility of [the alleged victim]." *Id.* at 188. Additionally, we noted that it was important because "[the witness's] testimony, although not completely consistent with [the defendant's] testimony, contradict[ed] several aspects of [the alleged victim's] testimony." *Id.* at 188. Ultimately, we determined that the defendant had established prejudice because the undiscovered evidence would have "affect[ed] the entire evidentiary picture" given that the evidence would have undermined "the credibility of [the alleged victim,] the only witness who gave direct evidence of [the] defendant's guilt." *Id.* (internal quotation marks omitted).

---

9. In fact, Matt's testimony on this issue was surprisingly vague. Matt never testified about the precise time that he placed either of the two phone calls. And he testified that it only took "20–25 minutes" for his girlfriend to drive from her work in Draper to Matt's house in Midvale

and for the two of them to drive up to Ms. S.'s apartment in Bountiful. Yet Mr. Gregg's trial counsel did not press Matt on this claim, and counsel did not ask Matt to clarify when he placed the phone calls.

¶ 37 Here too, Mr. Gregg's counsel failed to investigate and present crucial evidence that would have affected the entire evidentiary picture. Evidence of the 47–minute window would have undermined Ms. S.'s overall credibility, which is particularly important because her testimony provided the only direct evidence of Mr. Gregg's guilt. And those facts also would have contradicted Ms. S.'s testimony that the alleged rape occurred in a matter of minutes between the two phone calls, and it would have corroborated Mr. Gregg's claim that consensual intercourse culminated after almost an hour of sexual foreplay.

¶ 38 Ms. S.'s testimony portrayed a sudden attack that occurred in a matter of minutes. She testified that the rape began shortly after Matt's 3:20 a.m. phone call. Specifically, Ms. S. testified that after she got off the phone with Matt she and Mr. Gregg briefly resumed kissing. She stopped Mr. Gregg, and said "no" several times. According to her testimony, Mr. Gregg then immediately grabbed her ankles and commenced nonconsensual intercourse. She testified that intercourse was quickly interrupted by Matt's second phone call.[10] The prosecution's closing argument further suggested that this scene played out in a matter of minutes by reiterating that shortly after the 3:20 a.m. phone call, Ms. S. told Mr. Gregg "no" several times, whereupon Mr. Gregg "commenced immediately to place her down on the couch and start that process.... Here was a man who promised he wouldn't have sex and all of a sudden, it's going on." Thus, Ms. S.'s testimony and the prosecution's closing argument gave the jury the distinct impression that this was a sudden attack that occurred in a matter of minutes.

¶ 39 But Ms. S.'s testimony is directly contradicted by the police report. It was not merely a matter of minutes between Matt's phone calls. In fact, the police report indicates that there was actually a 47–minute window of time between the two calls. According to the police report, Matt first called

Ms. S. at 3:20 a.m. and then again at 4:07 a.m. when he arrived at her apartment. Ms. S. testified that the alleged rape began shortly after the first phone call and was interrupted by the second phone call. But her testimony also suggested that the time between the two phone calls was merely a matter of minutes. Thus, evidence of the 47–minute window between the two phone calls would have undermined Ms. S.'s credibility as well as the plausibility of her account of the rape. This is particularly troubling given that her testimony was the only direct evidence of Mr. Gregg's guilt.

¶ 40 This 47–minute time period also would have corroborated Mr. Gregg's account of events. Mr. Gregg maintains that consensual intercourse culminated after nearly an hour of sexual foreplay. According to Mr. Gregg, after the 3:20 a.m. phone call, Mr. Gregg and Ms. S. resumed consensual sexual activity. They paused for a brief conversation about how far they were willing to proceed, and he agreed that they would stop whenever she wanted. According to Mr. Gregg, Ms. S. agreed to resume kissing and engage in consensual sexual activity. Things gradually escalated to intercourse, at which point Ms. S. asked him to turn off the lights and helped him take off her pants. According to Mr. Gregg, Ms. S. did not stop consensual foreplay, and she never said "no" after their initial conversation following the 3:20 a.m. phone call.

¶ 41 The police report indicates that Matt called Ms. S. at 3:20 a.m. and again at 4:07 a.m. This 47–minute time frame would have corroborated Mr. Gregg's story that Ms. S. consented to intercourse after a gradual progression of consensual foreplay over the course of about an hour. This evidence regarding the timing of the phone calls is critical to determining whose account more accurately portrays the events of that night, especially in a case where consent was the only contested issue at trial. This evidence also would have undermined Ms. S.'s testi-

---

**10.** According to Ms. S., after she got off the phone with Matt, she and Mr. Gregg briefly resumed kissing. Then she stopped and told Mr. Gregg, "I don't want to do this.... I think you can handle this.' [And he responded,] 'You just can't do this to me.' And I said, 'No.' And he grabbed my ankles and slid me down on the couch." Ms. S. testified that at this point Mr. Gregg began to rape her. Ms. S.'s phone rang again shortly thereafter, interrupting the rape.

mony, which suggested that nonconsensual intercourse occurred suddenly after Matt's 3:20 a.m. phone call. The 47–minute time frame, like the testimony in *Templin*, while not perfectly corroborating either Ms. S.'s or Mr. Gregg's story, is crucial to this credibility determination because it suggests that Mr. Gregg's account more accurately portrays what actually occurred that night. *See id.*

¶ 42 The failure to investigate this evidence establishes prejudice under *Strickland*'s second prong because it "affect[ed] the entire evidentiary picture." *Id.* (internal quotation marks omitted). It would have undermined Ms. S.'s overall credibility, as well as the plausibility of her account of the alleged rape. This evidence also would have tended to corroborate Mr. Gregg's account of the events. As we noted in *Templin*, "[a]n appellate court cannot discern the exact effect such [evidence] would have had on the jury's judgment concerning the credibility of [the defendant] and [the alleged victim]." *Id.* However, where the evidence is of "sufficient import that we feel there is a reasonable probability that [had this evidence been investigated and presented at trial], the outcome of the trial would have been different," we may nevertheless conclude that *Strickland* has been met. *Id.* at 188–89. Evidence of the 47–minute time period between the calls, coupled with evidence of Ms. S.'s LDSSO e-mails, convince us that if this evidence had been presented at trial, there is a reasonable probability that Mr. Gregg would have been acquitted. Accordingly, we hold that Mr. Gregg received ineffective assistance of trial counsel.

### B. Mr. Gregg Received Ineffective Assistance of Appellate Counsel

¶ 43 Mr. Gregg also argues that he received ineffective assistance from his appellate counsel when appellate counsel failed to argue that trial counsel performed deficiently with respect to the LDSSO e-mails and the 47–minute period. The State argues that Mr. Gregg's claims "could have been raised" on direct appeal, and thus are procedurally barred under the PCRA, Utah Code section 78–35a–106(1)(c). In its motion for summary judgment in the district court, the State argued that Mr. Gregg's claims regarding the 47–minute time frame and Ms. S.'s LDSSO e-mails were procedurally barred "because they could have been raised on direct appeal." And in its brief to this court, the State Attorney General's office again argues that Mr. Gregg " 'could have' raised [these] ineffective assistance claim[s] on direct appeal." Thus, the entire thrust of the State's argument is that these claims are procedurally barred under the PCRA, Utah Code section 78–35a–106(1)(c).[11] But this argument ignores the PCRA's exception, which provides that "a person may be eligible for

11. The dissent argues that Mr. Gregg's claims are precluded under the PCRA because they *were argued* or addressed on direct appeal. *See infra* ¶¶ 53–58. This position is unavailing. First, while there are oblique references in the court of appeals' opinion about trial counsel's failure to research and investigate, these references are insufficient for us to conclude that these specific claims were raised and addressed on direct appeal. And there is nothing in the record to support this claim. *See infra* ¶ 47 n. 13. Second, the statute explicitly places the burden on the State to "plead[] any ground of preclusion" under the PCRA, but the State has never pled the preclusionary ground advocated by the dissent. UTAH CODE § 78–35a–105 (2007); *see also infra* ¶ 47 n.13. Specifically, the State has never alleged that Mr. Gregg's claims are precluded because they were raised or addressed on direct appeal. Instead, the State made the strategic decision to argue only that these claims "could have been but [were] not raised at trial or on appeal" under section 106(c). UTAH CODE § 78–

35a–106(1)(c). This position is inconsistent with the preclusionary ground advocated by the dissent. Under the PCRA, a claim may be precluded because it *"was raised* or addressed ... on appeal," or alternatively, because it "could have been but *was not raised* ... on appeal." *Id.* § 78–35a–106(1)(b), (c) (emphases added). Either the claim was addressed, or it was not addressed but could have been. *See id.* These two grounds of preclusion are mutually exclusive. In this case, the State made the strategic decision to argue that Mr. Gregg's claims were precluded under subsection (c) because the claims "could have been but [were] not raised ... on appeal." *Id.* § 78–35a–106(1)(c). This strategic decision precluded the State from arguing that Mr. Gregg's claims were actually "raised or addressed ... on appeal" under subsection (b), as the dissent advocates. *Id.* § 78–35a–106(1)(b). We will not dismiss Mr. Gregg's petition based on a ground of preclusion that is flatly inconsistent with the preclusionary ground that the State actually asserts.

relief on a basis that the ground could have been but was not raised at trial or on appeal, if the failure to raise that ground was due to ineffective assistance of counsel." UTAH CODE § 78B–9–106(2) (2007). And this provision controls because Mr. Gregg received ineffective assistance of both appellate counsel and trial counsel.

¶ 44 As with ineffective assistance of trial counsel claims, a petitioner claiming ineffective assistance of appellate counsel must prove that his appellate counsel provided ineffective assistance under *Strickland*'s two-part test. *Lafferty*, 2007 UT 73, ¶ 39, 175 P.3d 530. Specifically, "to prevail on a claim of ineffective assistance of appellate counsel, a petitioner must prove that appellate counsel's representation fell below an objective standard of reasonable conduct and that the deficient performance prejudiced [him]." *Id.* (alteration in original) (internal quotation marks omitted). Where a petitioner is claiming ineffective assistance of counsel "for omitting a claim, he must show that the issue [was] obvious from the trial record and ... probably would have resulted in reversal on appeal." *Id.* (alterations in original) (internal quotation marks omitted).

¶ 45 Mr. Gregg clearly articulated his concern that trial counsel failed to fully develop the underlying facts of his case. After trial, Mr. Gregg requested that the court allow his trial counsel to withdraw. Mr. Gregg's letter to the court reads:

> Last week I contacted [my trial counsel's] office [and] completely of my own voluntary choice, after much thought, I asked [my attorney] to withdraw as my counsel. My reasons for doing so were two-fold, but the primary and most important reason is because I do not want him to represent me because I have no confidence in him. I feel this way because [my attorney] made serious errors at trial, with the biggest being not presenting facts that are critical [and] essential to my case, and which may have made a difference at trial. I discussed these facts with him multiple times

over the time between my arrest in February and my trial in July. I asked him to present many of these points at trial, but he did not do so. The omissions/errors were blatant to the degree that I am not willing to place my future in his hands (unless forced by the Court to do so), and ... I am seriously considering fil[ing] a complaint with the Utah State Bar.

These concerns, which were plainly apparent in the record, should have made appellate counsel acutely aware of potential ineffective assistance of counsel claims.[12] And while "[a]ppellate counsel is not obligated to raise every nonfrivolous issue on appeal ... [and may] [instead] winnow out weaker claims in order to focus effectively on those more likely to prevail," *id.* ¶ 49 (second and third alterations in original) (internal quotation marks omitted), this does not excuse appellate counsel from ignoring obvious errors that would have influenced the trial's outcome, *see id.* ¶ 39.

¶ 46 In this case, the record clearly indicated that trial counsel failed to present key facts at trial that would have likely had an effect on the trial's outcome. For instance, the record plainly shows that Mr. Gregg subpoenaed Ms. S.'s e-mail records from LDSSO pro se, that trial counsel had failed to request these records, and that the e-mail messages severely undermined Ms. S.'s credibility, thereby undermining confidence in the trial's outcome. The record also reveals that Mr. Gregg's trial counsel failed to introduce evidence that the alleged assault occurred during a 47–minute period, despite its obvious presence in the police report and defense counsel's unsupported reference to the time frame in his closing argument. And the record shows that counsel's failure to introduce this evidence prejudiced the outcome at trial because the evidence would have corroborated Mr. Gregg's story and would have conflicted with Ms. S.'s depiction of events.

¶ 47 Mr. Gregg's appellate counsel failed to allege these ineffective assistance of trial counsel claims even though they were obvi-

---

12. We note that a defendant alleging ineffective assistance of appellate counsel need not point to a prior allegation of ineffective assistance of his trial counsel to prevail on his claim. All that is

required is that there are obvious errors in the record that would have probably resulted in a different outcome at trial. *Lafferty*, 2007 UT 73, ¶ 39, 175 P.3d 530.

ous from the record. Instead, on direct appeal, appellate counsel merely reargued the points of Mr. Gregg's pro se motion to arrest the judgment. And in Mr. Gregg's motion for remand, appellate counsel made only the general allegation that trial counsel failed to "research, investigate, and use evidence ... to impeach the testimony of the victim," without reference to Ms. S.'s LDSSO e-mails or the 47–minute window of time.[13]

¶ 48 Appellate counsel's failure to allege ineffective assistance of trial counsel regarding the LDSSO e-mails and the 47–minute time period prejudiced Mr. Gregg's direct appeal under the second prong of *Strickland*. The court of appeals affirmed Mr. Gregg's conviction based on Ms. S.'s testimony. Specifically, the court of appeals noted "the question of guilt or innocence often depends on the weighing of the credibility of the victim against that of the accused" and ultimately affirmed Mr. Gregg's conviction because there was sufficient evidence to support the verdict, "namely, [Ms. S.'s] testimony." *State v. Gregg*, 2005 UT App 258U, para. 4, 2005 WL 1314900 (internal quotation marks omitted). Had appellate counsel presented these claims of ineffective assistance of trial counsel, this would have seriously undermined Ms. S.'s credibility and likely changed the outcome on appeal. By failing to present and clearly articulate these obvious claims on direct appeal, Mr. Gregg's appellate counsel provided deficient perform-

ance that prejudiced Mr. Gregg's appeal. Therefore, we hold that Mr. Gregg received ineffective assistance of appellate counsel under *Strickland*.[14]

## CONCLUSION

¶ 49 We conclude that Mr. Gregg received ineffective assistance from both his trial and appellate counsel in violation of the Sixth Amendment. Therefore, we vacate his conviction and remand for new trial.

Justice PARRISH authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, and Justice DURHAM joined.

Justice LEE filed a dissenting opinion.

Justice LEE, dissenting:

¶ 50 David Vincent Gregg was convicted of rape in a trial in which the only real issue was consent. Gregg admitted to having sexual intercourse with Ms. S. in the wee hours of February 16, 2003, but insisted that she had consented to participate in that act. Ms. S. vehemently refuted that assertion, testifying at trial that she unequivocally said "no" when Gregg pressed for sex and explaining that Gregg had grabbed her by the ankles and slid her onto a couch where he raped her. The jury bought Ms. S.'s story and rejected Gregg's defense, finding him guilty of one count of rape.

---

**13.** The court of appeals' 23B remand decision does not articulate exactly which ineffective assistance claims Mr. Gregg alleged on direct appeal, and the original motion is not in the record. Moreover, the State has not argued that these issues were presented to or addressed by the court of appeals. The PCRA places the burden on the State to plead "any ground of preclusion under Section 78–35a–106." UTAH CODE § 78–35a–105 (2007). The statute is clear that the burden shifts to the petitioner to disprove the existence of a ground of preclusion only "once a ground has been pled" by the State. *Id.* Additionally, our appellate rules require that arguments include "contentions and reasons of the [party] with respect to the issues presented, including ... citations to the authorities, statutes, and parts of the record relied on." UTAH R.APP. P. 24(a)(9), (b). Therefore, we address only the State's argument that these claims "could have been raised" on direct appeal. The dissent insists that the State only had an obligation to allege any ground of preclusion under the PCRA

at the district court level, and that the burden is now on Mr. Gregg to disprove the existence of a ground of preclusion. *Infra* ¶ 60 n.3. The statute does not make this distinction. *See* UTAH CODE § 78–35a–105 (2007). And regardless, the State never argued this ground of preclusion below. Both at the district court and now on appeal, the State argued only that these issues "could have been raised" on direct appeal. The State has never argued that they were actually raised or addressed. Therefore, the State has not met its burden to plead "any ground of preclusion" under the PCRA. *See id.*

**14.** Because we hold that Mr. Gregg received ineffective assistance of trial and appellate counsel, we need not address Mr. Gregg's arguments regarding the constitutionality of the PCRA. *See Gardner v. State*, 2010 UT 46, ¶ 93, 234 P.3d 1115 (noting that it is "our obligation to avoid addressing constitutional issues unless required to do so" (internal quotation marks omitted)).

¶ 51 The jury's verdict had ample basis in the record. Gregg, after all, had conceded in a pretext call made by Ms. S. two days later that she had repeatedly said "no" to his sexual overtures, acknowledged that he had promised her he would not move beyond the kissing and foreplay that Ms. S. had agreed to, and insisted only that he never physically forced her to engage in sex and thought she had changed her mind. In light of the evidence, the jury understandably found Gregg guilty. It understood that Ms. S.'s "no" meant "no," and that she was entitled to reject Gregg's moves toward intercourse despite participating voluntarily in kissing and foreplay. And it understandably rejected Gregg's notions that he thought Ms. S. had changed her mind and had never physically forced her to allow him to rape her.[1]

¶ 52 The court today vacates that conviction and remands the case for a new trial. It does so on the basis of its conclusions that Gregg's prior counsel performed below an objective standard of reasonableness and that there is a reasonable probability that Gregg would have been acquitted but for that deficient performance. I respectfully dissent. First, I conclude that Gregg's ineffective assistance claims are procedurally barred under the Post–Conviction Remedies Act because prior appellate counsel either actually litigated the claims before us today or reasonably declined to litigate such claims in favor of stronger ones. Second, assuming for the sake of argument that Gregg's claims are not barred, they fail on the merits. Counsel acted reasonably in basing its consent defense on the evidence in the record at trial and in not pressing further investigation into the additional evidence identified by the majority. And because that additional evidence only marginally supported Gregg's defense, there is no reason to think that it would have changed the verdict.

### I

¶ 53 The PCRA forecloses relief on any ground that "was raised or addressed at trial or on appeal." UTAH CODE § 78B–9–

106(1)(b). It also bars any claim that "could have been but was not raised at trial or on appeal," *id.* § 78B–9–106(1)(c), unless "the failure to raise that ground was due to ineffective assistance of counsel," *id.* § 78B–9–106(3). Because Gregg's counsel on direct appeal could have raised claims of ineffective assistance of trial counsel, a challenge to the effectiveness of trial counsel is barred unless "the failure to raise that ground [ineffective assistance of trial counsel] was due to ineffective assistance of [appellate] counsel." *Id.* Thus, as the majority indicates, under the PCRA a "petitioner must prove that he received ineffective assistance from both his trial counsel and his appellate counsel." *Supra* ¶ 18.

¶ 54 Gregg's claims are procedurally barred, then, if he cannot establish ineffective assistance of appellate counsel. In my view Gregg's case falters on this threshold point, as his counsel on direct appeal actually raised—or could have raised—the claims he presses now under the PCRA.

¶ 55 As the majority indicates, the record as it stands does not indicate with crystal clarity the nature or extent of Gregg's appellate counsel's challenges to trial counsel's effectiveness. *Supra* ¶ 47 n. 13. But I respectfully disagree with the court's decision to conclude that appellate counsel utterly "failed to allege" the ineffectiveness claims that are before us in this PCRA case, much less with the notion that the motion for remand filed in Gregg's direct appeal included "only the general allegation that trial counsel failed to 'research, investigate, and use evidence ... to impeach the testimony of the victim,' without reference to [Ms. S's] LDSSO e-mails or the 47–minute window of time." *Supra* ¶ 47 n. 13 (alteration in original). In fact, the ellipsis in the foregoing quote from the motion for remand omits references that in context seem clearly to refer to precisely these points.

¶ 56 The full quote (*sans* ellipsis) from the court of appeals' order denying Gregg's motion for remand indicates that his appellate counsel argued "that trial counsel was inef-

---

**1.** *State v. Hammond*, 2001 UT 92, ¶ 16, 34 P.3d 773 ("Intercourse without consent is all that is required for rape ....; no force is required.").

fective in two respects: first, in failing to investigate possible juror misconduct during the trial and, second, in failing to research, investigate, and use evidence from potential witness Jessica, the 'ldssingles.com' website, and police reports to impeach the testimony of the victim." In context, the reference to a failure to investigate evidence from "the 'ldssingles.com' website" to impeach Ms. S.'s testimony can only refer to the claim accepted by the majority today—that electronic communications from Ms. S. on that website could have undermined her testimony that she canceled her LDSSO subscription and ceased using the dating service after her experience with Gregg.[2] No one has identified any other impeachment purpose of evidence found on that website, so the only reasonable conclusion to be drawn from the record as it stands is that Gregg's appellate counsel litigated (and lost) on the question whether trial counsel was ineffective for failing to find and use the electronic communications that are before us today.

¶ 57 A parallel inference can be drawn from the Court of Appeals' reference to trial counsel's alleged ineffectiveness in not investigating and using evidence from "police reports" for impeachment purposes. In context, this was an obvious allusion to the second claim endorsed by the majority today—that "[t]he police report indicates that Matt called [Ms. S.] at 3:20 a.m. and again at 4:07 a.m.," supposedly confirming "that there was a 47–minute window of time" when the rape could have occurred. *Supra* ¶¶ 33, 41, 47. And again, there is no indication of any impeachment purpose for any other evidence in the police report, so again it is apparent that Gregg's appellate counsel litigated (and lost) on the question whether trial counsel was ineffective for failing to find and use the police report at issue today.

¶ 58 Thus, Gregg's ineffective assistance claim in this PCRA action is procedurally barred because it "was raised or addressed . . . on appeal." UTAH CODE § 78–35a–106(1)(b). The bar holds, moreover, even absent the clarifying detail that could have been provided by the motion to remand filed by Gregg, which is apparently missing from the current record. *See supra* ¶ 47 n. 13. On this point, I cannot agree with the majority that the parties' PCRA briefs somehow left unclear "which ineffective assistance claims Mr. Gregg alleged on direct appeal" or whether the issues the court reaches here "were presented to or addressed by the court of appeals." *Supra* ¶ 47 n. 13. In fact, Gregg's own opening brief acknowledged that "[f]rom the appellate court's order it appears Mr. Gregg's counsel on his direct appeal sought remand under Rule 23B on the grounds of . . . failure to impeach [Ms. S.'s] testimony with evidence from the LDSSO website" and "failure to impeach [Ms. S.'s] testimony using 'police reports.' "

¶ 59 Even assuming, for argument's sake, that Gregg's appellate counsel did not actually raise this issue on direct appeal, the appellate court's order establishes that, at the very least, it could have been raised. That alone is enough to bar the claim under the PCRA. UTAH CODE § 78–35a–106(1)(c).

¶ 60 So perhaps the missing motion would elucidate the nature of appellate counsel's argument more fully, but there is little doubt that the claims addressed by the majority today were raised or at least could have been raised in Gregg's direct appeal. Indeed, the district court itself reached this conclusion in dismissing Gregg's first amended PCRA petition, holding that the same ineffective assistance of counsel claims presented here "were resolved by the Court of Appeals in . . . its Order denying remand under Rule 23B."[3]

---

2. In fact, this is the only evidence that Gregg's appellate counsel could have been seeking, given that trial counsel knew of and made reference to the only other relevant evidence from the site—the dates and times that Ms. S. accessed LDSSO following the incident.

3. Because Gregg conceded this point in his brief and the district court ruled conclusively on it, we can hardly fault the State for failing to address it.

*See supra* ¶ 47 n. 13 (noting that the "PCRA places the burden on the State to plead 'any ground of preclusion' " and chiding the State for not demonstrating that these issues "were presented to or addressed by the court of appeals"). As the majority indicates, the State bears the burden of pleading grounds for preclusion. The State properly carried that burden, as confirmed by the district court's decision dismissing the amended PCRA petition. Although the PCRA

Those claims are thus procedurally barred, and I would affirm on that basis.

## II

¶ 61 Even if we assume away the procedural bar for the sake of argument, I would still disagree with the court's decision to vacate Gregg's conviction. Gregg's counsel acted reasonably in basing the consent defense on the evidence in the record at trial instead of pursuing the collateral evidence identified in the PCRA petition. And even if Gregg's counsel had presented that evidence, it would have provided only marginal support for Gregg's consent defense and little reason to expect anything other than a guilty verdict at trial. Gregg's ineffective assistance claims accordingly fail at both steps of the analysis under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and his PCRA petition also fails on its merits.

### A

¶ 62 I am not persuaded that Gregg's counsel fell below the lenient standard for judging the effectiveness of counsel's performance at *Strickland* step one. Gregg had a right to a lawyer that performed within the "wide range of reasonable professional assistance," *id.* at 689, 104 S.Ct. 2052, not one that would make every strategic move that might seem ideal in hindsight.[4] Counsel's conduct in this case strikes me as falling squarely

within the range of reasonable professional assistance, notwithstanding the additional investigation and impeachment identified by the court today.

¶ 63 At the threshold, I cannot agree with the majority's insistence that it can never be a reasonable tactical decision " 'not to investigate' " a particular matter. *Supra* ¶ 24. The court cites *State v. Templin*, 805 P.2d 182, 188 (Utah 1990), for that proposition, but *Templin* does not sustain this categorical conclusion. Under *Templin*, counsel's performance may be deficient "[i]f counsel does not *adequately* investigate the underlying facts of a case." *Id.* (emphasis added). Counsel's duty under *Templin*, then, is to conduct a "*reasonable* investigation," *id.* at 188 n. 25 (emphasis added), and that qualification not only permits but requires counsel to make decisions about when and where to begin and end its investigations on various matters in a case.

¶ 64 Such judgments are not only inevitable but necessary. Time is a naturally limited resource, as are funds for investigation. Even the best lawyers with the biggest budgets make inevitable decisions about when to stop investigating. It cannot be categorically unreasonable for a lawyer judged under the lenient *Strickland* standard to make those same judgments. Gregg's counsel's judgments in his rape case, moreover, strike me as quite reasonable.

does not expressly confine the State's burden to the *district court* stage, *supra* ¶ 47 n. 13, that limitation is evident in context. *Pleading,* by definition, takes place only in the district court. On appeal, it is the *appellant* (not the State) that bears the burden, and that burden is to advance grounds for overturning the district court's decision, with argument and citation to relevant legal authority. UTAH R.APP. P. 24. Gregg failed to carry that burden with respect to the district court's determination that his claims were barred in light of their resolution on direct appeal by the court of appeals. In fact, Gregg's opening brief in this court openly conceded that fact. In the face of that concession, the State had no further burden under the PCRA or otherwise.

Gregg's only argument on this appeal on this issue was the unsupported, unexplained assertion that the court of appeals' denial of the rule 23B motion was somehow "not a full and fair

adjudication" of these issues. That assertion was made without any citation to any authority, however, and the State accordingly had no duty to respond to it.

4. *See Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624, (2011) ("Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. *It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.*" (emphasis added) (internal quotation marks omitted)); *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (internal quotation marks omitted)).

¶ 65 First, as to the LDSSO e-mail, it seems clear from the record that trial counsel made a reasonable tactical decision to conduct a cross-examination at a high level of generality that did not delve into the detail of specific e-mail messages. Thus, counsel did in fact challenge Ms. S.'s credibility by questioning her assertion that she had sworn off the LDSSO dating service due to her anxiety over her encounter with Gregg. Counsel did so at trial by noting in cross-examination that Ms. S. had logged onto LDSSO seventeen times after February 15, 2003.[5] By referring generally to this extensive logon activity, counsel was able to insinuate that Ms. S. had lied about her anxiety over LDSSO and her immediate termination of online activity.

¶ 66 The majority insists that the electronic messages indicated a "light-hearted" attitude by Ms. S. in her online communication and that the messages were thus "essential" to the impeachment of her credibility. *Supra* ¶¶ 28–29. I disagree on both counts. There is nothing particularly probative about the electronic messages quoted by the majority. At most, they simply indicate Ms. S.'s desire to "keep in touch" and convey polite salutations and well wishes. I accordingly see nothing remotely essential—or even

helpful—about those messages in impeaching Ms. S.'s credibility.

¶ 67 I also disagree with the majority's conclusion that these "light-hearted" messages "would have conflicted with [Ms. S.'s] story that she was so distraught after her encounter with Mr. Gregg that she suffered an anxiety attack and swore off the LDSSO dating service altogether." *Supra* ¶ 27.[6] If anything, the electronic messages confirm an essential part of Ms. S.'s story—that she was terminating her use of the LDSSO website.[7] They do so by clearly indicating that her membership was expiring immediately and that any further communication would have to be by other means. Thus, without the electronic messages in the record, defense counsel was able to attack Ms. S.'s credibility generally—and relatively effectively—by insinuating that her *seventeen* logons after February 15 were flirtatious uses of the LDSSO site that contradicted her stated anxiety over further use of the site due to her experience with Gregg. If the messages had been in the record, by contrast, defense counsel would have had to deal with the fact that the content of Ms. S.'s actual online communications were non-flirtatious and confirmed the essence of her testimony.

¶ 68 Thus, in my view counsel's decision not to use the LDSSO electronic communica-

---

**5.** Gregg's counsel initially asked Ms. S. whether she was "so disgusted with what [she] believed occurred [with Gregg that she] never again logged onto the [LDSSO] chat line." Ms. S. replied that her "membership expired shortly after that." Later, counsel pressed her and asked whether she had "any reason to dispute" that she "logged in seventeen times since February 15 of 2003," including "the day after [the incident]." In response, Ms. S. stated "[t]hat's what [the document] says. I guess I did." Counsel later pressed these issues on re-cross-examination, questioning both the timing and legitimacy of Ms. S.'s withdrawal from the LDSSO service, and whether she actually experienced any anxiety attacks following the incident.

**6.** These points, moreover, *were* addressed by both Gregg's trial counsel and the prosecution in the course of Ms. S.'s testimony. Following cross-examination (wherein the defense attacked her true motives for reaccessing the site) Ms. S. corrected her prior testimony, conceding that she had "respond[ed] to ... messages" that had been sent to her after the incident with Gregg and that there were "a few times that [she] had to go in to

pull [her] own profile for the police or [Gregg's] profile off for the police." The prosecutor then asked Ms. S. to clarify that she "never [again] subscribed to [LDSSO]." On recross, defense counsel again questioned Ms. S.'s motives for accessing LDSSO and then cast doubt on whether she even "had anxiety attacks," noting that they'd never been mentioned in "any medical reports" or in her "own report." Thus, defense counsel did attempt to contradict Ms. S.'s testimony with the available evidence. The majority's conclusion that the contents of Ms. S.'s post-incident LDSSO e-mails could or would have contradicted her testimony more effectively than the evidence and argument actually presented is the very definition of *post hoc* second-guessing by an appellate court.

**7.** The court gets it exactly backwards in my view in asserting that the online messages "would have directly refuted [Ms. S.'s] claim that she swore off the dating service." *Supra* ¶ 28. The messages *confirmed* that element of her story, so it was only without them that counsel could plausibly insinuate that the seventeen logons refuted this point.

tions was a wise tactical move. At the very least it was a decision within the wide range of reasonable judgments that a trained lawyer could make, and that is all that is necessary to reject Gregg's claim at *Strickland* step one.

### 2

¶ 69 Second, trial counsel's failure to emphasize the 47–minute span between the two calls between Ms. S. and Matt was likewise reasonable. The precise length of time between these two phone calls would have contributed little or nothing to Gregg's defense. It certainly would not have persuasively "corroborated" Gregg's "account of events" or "undermined" Ms. S.'s, as the majority asserts. *Supra* ¶ 34. This discrepancy between Gregg's and Ms. S.'s respective "account of events," moreover, simply did not exist at trial. The majority seems to suggest that the jury was presented with two conflicting eyewitness accounts to weigh and analyze, but that was never the case here as Gregg did not testify before the jury. Aside from the arguments and questions of credibility and consent raised by his trial counsel and recorded statements made by Gregg to police, "Gregg's story" was presented to the court only at his sentencing hearing, months after the jury had deliberated, reached its guilty verdict, and been dismissed. Thus, there was little or no opportunity for the jury to weigh which "account more accurately portrayed what occurred," *supra* ¶ 41, since Gregg's personal account was not presented. In any event, to the extent the jury heard different accounts indirectly through evidence, cross-examination, and closing argument, there was no conflict as to the precise amount of time between Ms. S.'s phone calls with Matt, and thus no reason for trial counsel to highlight the timing point that the court today seems to find so telling.

¶ 70 At most, the fact that Ms. S.'s calls with Matt spanned 47 minutes indicates "that there was a 47–minute window of time between the two phone calls during which the rape allegedly occurred." *Supra* ¶ 33. That is because Ms. S. testified that she was involved in consensual kissing and foreplay with Gregg at the time of the first call and had intercourse by the time of the second one. But of course nothing in this case turns on the length of time between the acts of consensual foreplay and involuntary intercourse. The latter was (at least in the jury's minds) rape, and its status as rape is in no way affected by the amount of time Ms. S. participated in consensual foreplay.

¶ 71 Gregg was within his rights in participating in sexual activity for as long as Ms. S. consented. But Ms. S. was also entitled to refuse his overtures and eventual acts of sexual intercourse.[8] And the moment she said "no," Gregg was bound by law to stop. That moment could have been 46 minutes into the 47 minutes of consensual foreplay. (That, apparently, is the most defense counsel could have made of the 47–minute time span. And of course even the evidence cited by the majority doesn't come close to getting that specific.) But pinning down such a time period would in no way sustain the majority's conclusion that Ms. S. "consented to intercourse after a gradual progression of consensual foreplay over the course of about an hour." *Supra* ¶ 41.

¶ 72 The majority attempts to connect those dots by suggesting that Ms. S. testified that she was raped *immediately* after the initial phone call with Matt and that Gregg testified otherwise. Stating that Ms. S. testified that "the rape occurred in a matter of minutes between the two phone calls," *supra* ¶¶ 34, 37, the majority concludes that she "portrayed a sudden attack that occurred in a manner of minutes," *supra* ¶ 38. This terse and heavily edited retelling by the ma-

---

8. *See State v. Myers*, 606 P.2d 250, 252 (Utah 1980) (rejecting the notion "that if a woman is 'friendly' in accepting the proffered hospitality of a man . . . and engages in 'necking,' [kissing and hugging] and that this persists over a period of time, she loses her right to protest against further advances the man may desire to force upon her; and thereby subjects herself to such advances and should be deemed to consent to intercourse if he, but not she, so desires" and holding instead that "[n]either this Court nor the law will justify any such conclusion"); *see also State v. Herzog*, 610 P.2d 1281, 1283 (Utah 1980) ("One does not surrender the right to refuse sexual intimacy by the act of accepting another's company, or even by encouraging and accepting romantic overtures.").

jority notes only that, following Matt's first phone call, Gregg "said 'no' several times .... immediately grabbed [Ms. S.'s] ankles and commenced non-consensual intercourse." *Supra* ¶ 38 & n. 10. But that is not what Ms. S. presented to the jury.[9]

¶ 73 Ms. S. testified that after the first phone call she and Gregg discussed the conversation, and Gregg complimented her manners and listening skills. Ms. S. stated that they then "started back where [they] were, just kissing."[10] At some point after this later foreplay, Ms. S. testified that she became "very uncomfortable." When she expressed her hesitance at continuing, Gregg complained that she "[couldn't] do this to guys" because "stop[p]ing in the middle of something like that" was "very painful for men." They then discussed why this would be painful for Gregg and Ms. S. encouraged him "to calm down, to cool down," and elicited a promise from Gregg that they wouldn't have sex. At some point after this last discussion, Gregg said "[y]ou just can't do this to me" and then "slid her down on the couch." Ms. S. testified that Gregg then "kneeled down in front of [her]" and placed her hands on his penis and told her that "he knew that [she] wanted it."

¶ 74 At this point, Ms. S. indicated a hazy recollection of events. She testified that she recalled taking her hands off Gregg's genitals, but that Gregg then replaced them. Ms. S. then testified that she "froze," and

that she didn't "[r]emember him taking his pants off" or remember Gregg "taking [hers] off." The next thing Ms. S. remembered, Gregg was "on top of [her] and [her] phone was ringing."

¶ 75 This version of events between the first and second phone calls is hardly the rapid-fire, "immediate" account the majority describes. Ms. S. did not testify that the rape occurred a matter of moments after the first call or that it was a drawn-out process. In fact, Ms. S. didn't attempt to give a time frame for these events at all beyond her recollection that they started after the first phone call and were interrupted by the second call.[11] Instead, Ms. S. recounted discussions, conversations, some consensual foreplay, and a series of actions that she could not remember well. Accordingly, the police report would not have undermined Ms. S.'s account in the least, much less confirmed that she had consented to intercourse with Gregg.

¶ 76 The precise timing of the rape, moreover, was not an issue at trial (which is why the phone call evidence of timing would have been almost useless—hardly "critical to determining whose account more accurately portrays the events of that night," *supra* ¶ 41). The dispute, instead, was simply whether and to what extent Ms. S. refused Gregg's requests for and acts of sexual intercourse. Thus, while there may have been some potential for dispute regarding the tim-

9. The majority characterizes Ms. S.'s testimony about the events immediately preceding intercourse as a "sudden attack" occurring within "a matter of minutes," and that once she said no "several times," Gregg "*immediately* grabbed her ankles and commenced non-consensual intercourse." *Supra* ¶ 38 (emphasis added). Ms. S. never offered these kinds of time-related qualifiers, however. The majority seems to borrow this "sudden" characterization from the prosecutor, who in his closing represented that soon after the first call, Gregg "commenced immediately to place [Ms. S.] down on the couch and start that process." *Supra* ¶ 38. But this portrayal by the prosecution in closing cannot implicate deficient representation by Gregg's counsel, especially if his inadequacy was in failing to introduce evidence that could rebut the prosecution's closing argument. We can hardly fault defense counsel for failing to perfectly anticipate the kind of argument and characterization of events the prosecution was going to make in closing.

10. This statement directly contradicts the majority's characterization of Ms. S.'s testimony. The majority states that Ms. S. "suggested that non-consensual intercourse occurred suddenly after" Matt's first phone call, *supra* ¶ 41, but even Ms. S. admitted that they began to engage in more consensual foreplay following the call.

11. This time frame for the rape—commencing some time after the first phone call and being interrupted by the second—is consistent with Gregg's account as well. Thus, the only possible inference to be drawn between a few brief "moments" and "47 minutes" is how long their conversations and consensual foreplay lasted. As discussed above, however, a woman does not waive her right to say "no," regardless of the timing and extent of consensual foreplay. The question of timing is, therefore, immaterial to the inquiry whether Ms. S. consented to intercourse.

ing of the acts of foreplay and intercourse in relation to the two phone calls, there was not the sort of stark contrast in testimony and evidence on timing that would have made the 47–minute time span in the police report critical or even really relevant.

¶ 77 For that reason, trial counsel made a reasonable tactical decision to try to challenge Ms. S.'s credibility and sustain his theory of the case by focusing on other evidence in the record instead of harping on an esoteric timing point of marginal significance. For example, counsel focused much of his cross-examination of Ms. S. on how unusual it was for her to invite a near-stranger to her home late at night to just "sit there and talk." Counsel questioned her as to why she never asked Gregg to leave or go home, emphasizing that even though Ms. S. thought some of Gregg's behavior was "bizarre," she ultimately consented to kissing and foreplay. Aiming squarely at the issue of consent, counsel then fired off a series of questions at Ms. S.: whether she "let [Gregg] take [her] pants off," whether her pants or underwear were ripped, and why she "didn't scream" or "yell at [Gregg]" or tell Matt, "[M]y God, Matt. I've been raped." Then, in closing, counsel focused on a different, but likely more compelling timing issue that directly implicated Ms. S.'s credibility—that after Matt had arrived at Ms. S.'s home and called her from his car, rather than rushing out to meet Matt, Ms. S. asked him to "[g]ive us a couple of minutes," where after she escorted Gregg to his car and "hug[ged] and kisse[d] him."

¶ 78 I see no reason to second-guess a trial strategy that focused on these salient points instead of trying to turn a 47–minute span between two phone calls into a supposed refutation of Ms. S.'s story on the crucial issue of consent. In fact, any attempt to do so could easily have back-fired. If trial counsel had taken the position the majority takes today—that Ms. S. must have consented because she participated in voluntary foreplay for almost 47 minutes—the prosecution could have had a heyday in closing chiding the defense's suggestion that a woman who voluntarily engages in foreplay is somehow

bound to agree to sexual intercourse. That of course is not the law as noted above, and the jury was instructed accordingly.[12] The defense would likely have shot itself in the foot had it suggested otherwise.

¶ 79 If defense counsel had taken this tack, a jury could predictably have viewed it as an insensitive, misleading, or inappropriate attack on the state of mind of a rape victim. And an attentive prosecutor could have portrayed this theory as a distasteful attempt to paint Ms. S. as a liar solely because she was confused about the precise timing of a horribly traumatic incident. With these concerns in mind, a reasonable defense attorney could properly have decided to forego any fixation on the precise length of time between the two phone calls and make his points elsewhere.

¶ 80 At a minimum, it is again at least apparent that reasonable trial counsel could differ on the best strategy. And if a decision to buttress Gregg's story on consent and impeach Ms. S.'s in this way is at all debatable (as it clearly is), then Gregg's ineffective assistance claim on this point surely fails at step one under *Strickland.*

### B

¶ 81 I would also conclude that any arguable deficiency in counsel's trial strategy would not likely have changed the jury's guilty verdict, and thus that Gregg's claims also fail at *Strickland* step two. The court's analysis of this question is thin and its conclusion tenuous. It asserts without much discussion that the LDSSO communications and time frame from the police report somehow would have altered "the overall evidentiary picture" in the case. *Supra* ¶ 30.

¶ 82 I see no basis for elevating this evidence to that level. Unlike the majority, I see no comparison between this case and *State v. Templin,* where defense counsel failed to contact several prospective eyewitnesses "who had seen the defendant and the victim together on the date of the alleged rape" and offered eyewitness accounts that undermined victim's credibility and wholly

---

**12.** Jury Instruction No. 20 stated, in full: "One does not surrender the right to refuse sexual intimacy by the act of being friendly and accepting the hospitality and company of another."

contradicted several aspects of her story. 805 P.2d 182 at 187. The undeveloped evidence identified here does nothing of the sort. Gregg's trial counsel did not fail to contact eyewitnesses or subpoena evidence that would have directly contradicted any of Ms. S.'s testimony. Rather, trial counsel in fact made an extensive effort to sustain Gregg's theory on consent and to impeach her. And although it declined to feature the LDSSO or police report evidence in that effort, that can be defended as a reasonable tactical decision recognizing perils inherent in the "new" evidence cited in the PCRA petition. For that reason, there is no reason to treat that evidence as fundamentally affecting the "overall evidentiary picture" in the case, *supra* ¶ 30, or to give a reasonable basis for concluding that it would have altered the jury verdict.

### III

¶ 83 This was admittedly a close case at trial. Everyone agreed at trial that Ms. S. participated voluntarily in sexual foreplay and that the intercourse that ensued was not the result of physical force or violence. But Ms. S. testified that she unequivocally said "no" to Gregg's advances to intercourse, and the jury obviously believed her. That decision is entitled to our respect. I dissent because the court's decision today seems to me to second-guess the jury's verdict in ways that distort the law under the PCRA and under *Strickland v. Washington*.