2021 UT App 74

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
WILLIAM ALEXANDER TORRES-ORELLANA,
Appellee.

Opinion
No. 20190599-CA
Filed July 9, 2021

Second District Court, Ogden Department
The Honorable Camille L. Neider
No. 171900272

Sean D. Reyes and David A. Simpson,
Attorneys for Appellant

Emily Adams, Freyja Johnson, and Cherise Bacalski,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGE DAVID N. MORTENSEN concurred. JUDGE RYAN M. HARRIS
concurred, with opinion.

ORME, Judge:

¶1      After a jury convicted William Alexander Torres-Orellana on one count of rape, Torres[1] moved for a new trial. He argued that his trial counsel (Trial Counsel) rendered constitutionally ineffective assistance by not seeking to admit "friendly" post-rape text messages exchanged between Torres and the victim. The trial court agreed and granted a new trial. The State appeals, and we reverse.

---

1. Consistent with the parties' briefing, we refer to Torres-Orellana as Torres.

## BACKGROUND[2]

¶2      In July 2016, seventeen-year-old Tiffany[3] met Torres, who was then nineteen, at her place of work. Soon thereafter, they began communicating via text message "on and off" and "hung out a couple times." Things got more serious by December, and they eventually began dating.

¶3      Because Tiffany had just given birth in November, she told Torres via text message, soon after they began dating, that she was not yet physically and emotionally ready for sex. Torres told her, "I want to do it but I can wait baby for you as long as you want till you ready to do it," and assured her, "i really don't mind waiting."[4] In response, Tiffany told Torres that she felt that

---

2. Although the trial court granted Torres a new trial, it did not do so on the ground that there was insufficient evidence to support the jury's verdict. Accordingly, "we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Gregg v. State*, 2012 UT 32, ¶ 2, 279 P.3d 396 (quotation simplified).

3. We adopt the pseudonym used by the parties in briefing. *See* Utah R. App. P. 24(d) ("The identity of minors should be protected by use of descriptive terms, initials, or pseudonyms.").

4. As is not uncommon, the text messages between Torres and Tiffany are fraught with shorthand, misspellings, a lack of punctuation, and incorrect grammar. With one exception, we quote them verbatim, which is the way they were introduced at trial, lest there be any concern that in fixing them we have distorted them, and to spare the reader more brackets than one could reasonably be expected to endure. The exception is that we have substituted bracketed references for the names of individuals.

she had been taken advantage of in her prior relationships, but Torres was "different" and that she "fell . . . hard" for him. Torres responded affectionately.

*The Rape*

¶4     On January 31, 2017, Tiffany made plans to go to the mall with Torres. Torres picked her up in his vehicle just after 7:30 p.m. Tiffany's mother (Mother) expected her home by 9:00 p.m. After leaving home, Tiffany soon noticed that they were not heading to the mall and asked where they were going. Torres responded that they "were going for a drive," and he eventually pulled over at a nearby park. There, the two talked for about an hour and "[k]issed a couple of times." Torres, who was sitting in the driver seat that he had reclined "and pushed all the way back," then asked Tiffany "to get on top of him." When Tiffany refused, Torres attempted to pull her on top of him. Tiffany told him, "no," and that she "didn't want to." Having not succeeded in pulling Tiffany on top of him, Torres then repeatedly told her "to blow" him. Tiffany initially refused, but Torres was persistent, and she eventually gave in and "did it for just a little bit." She then stopped and told him she "didn't want to anymore."

¶5     In response, Torres became "more determined" and told her again "to get on top of him." He then grabbed her by the arms and pulled her on top of him so that she was facing him and began pulling down her pants. Tiffany resisted, but to no avail, as Torres was "much stronger." She told him "multiple times" that she "didn't want to," but Torres ignored her demands and began kissing her chest and body and then inserted his penis into her vagina. Tiffany fought back and eventually, after "five minutes at the most," succeeded in pushing herself back into the passenger seat.

¶6     Torres begged her "to keep going" and told her "it would only take a couple more minutes . . . for him to finish." Tiffany

refused and told him that she "was going to get in trouble and not be able to hang out with him anymore" if he did not take her home, but Torres "just kept begging." At that point, Tiffany texted Mother that Torres would not bring her home, and Mother responded by asking where they were. After seeing this text exchange, Torres took Tiffany home.

¶7 When they pulled up to the house, Torres tried to kiss Tiffany, but she pulled away and opened the car door. He then told her, "I love you," but Tiffany just shut the door and walked toward Mother, who was outside waiting for her. Inside, Mother noticed that Tiffany's "demeanor was off" and asked what had happened and whether Torres had hurt her or forced her to have sex. Tiffany "broke down" and responded, "Yeah." Mother immediately reported the rape to law enforcement.

¶8 That same night, a sexual assault nurse examiner (Nurse) examined Tiffany. The exam revealed bruises on Tiffany's neck, some of which were "very consistent with sucking," and others that appeared to be "more from pressure or a hand." Tiffany told Nurse that those injuries "occurred during the assault with kissing, sucking, and grabbing of her neck" by Torres. Tiffany also had bruising to her breasts that was "certainly . . . consistent with grabbing of the breasts" and "with sucking." Nurse also noted multiple linear bruises and abrasions to Tiffany's knees and legs that occurred "with different motions" and concluded they were consistent with Tiffany's account of being pulled onto Torres, fighting him, and hitting against various objects in the car.

¶9 The genital exam revealed "multiple sites of injury," including a rugburn-like abrasion; a small, bleeding laceration to the perihymenal tissue; and a laceration to the right labia major that was 2.5 centimeters in length and consistent "with a dragging injury." Referring specifically to the 2.5 centimeter laceration, Nurse testified at trial that out of the approximately

200–300 sexual assault examinations she had conducted throughout her 12-year career, she had seen only "probably three" cases in which the injuries were as severe as Tiffany's. Based on the injuries she observed, Nurse confirmed that it was "safe to say that the vagina was penetrated." She also concluded that "several different motions" probably caused the injuries and that the number of injuries suggested non-consensual sex because in "consensual experiences, typically you would readjust or change something if something was uncomfortable or hurt you" and the "several sites of injury here indicate that there's not a correction to prevent injury."[5]

¶10　The forensic scientist who analyzed Tiffany's sexual assault kit testified that swabs of the perineal area revealed male DNA but in an insufficient quantity to extract a full profile. The swab of the vaginal area revealed no male DNA. He testified that possible reasons for the lack of male DNA included no penetration, transient penetration, ejaculation with low sperm count, and wiping or cleaning the genital area.

*Post-rape Communication*

¶11　Shortly after Torres dropped Tiffany off at her home, he texted her, "Babe I'm sorry I love you babe," followed by, "I'm sorry babe I was alittle tired, sorry I couldn't please you, I bet you hate me now babe I miss you." The next morning, Torres sent another text message asking Tiffany to let him know when she woke up. The following exchange ensued:

---

5. Nurse also testified that the genital injuries were unlikely to be due to the childbirth Tiffany endured two months earlier because "even a more severe laceration from childbirth [is] usually . . . completely healed at six weeks."

[TIFFANY:] I just don't wanna talk anymore, you knew I didn't want to have sex, i told you multiple times and you still did it[6]

[TORRES:] What do you mean? N Babe I did but I saw that you wanted too but I didn't know, I didn't wanted to do it either, n i know you told me multiple times, n I'm so sorry I should of just stoped. Forgive me, I won't do it again.

[TIFFANY:] Well why did you do it even though I told you no and I didn't want to

[TORRES:] I don't know babe,n I know I'm sorry, I don't know how to tell you I'm sorry, I don't want to be fighting with you, I want to be a happy couple, forgive me I won't do it again

. . . .

You and [your baby] are the only persons I cared about I freaking love you two but all that is gone and I feel terrible about myself

[TIFFANY:] Yeah. You really hurt me.

[TORRES:] And I feel terrible about that, and all I wanted was to never hurt you, I just don't know what to do, I really want you and [your baby], I want to have a family with you I miss you n just the thought that I won't have you hurts me I want to fix this

---

6. Tiffany sent this first message at the direction of a police detective who was interviewing her at that time.

. . . .

[TIFFANY:] How am I supposed to let someone who forced me to have sex fix it. How are you supposed to fix that

[TORRES:] I'm so sorry for that I didn't mean to, n I don't know, I just wish there was I way

¶12 Their text conversation continued in a similar manner for another week, during which Torres repeatedly asked for forgiveness, including the following statements:

- "I'll do everything on my power to never hurt you ever again"

- "what I've done is just hurt the girl of my dreams"

- "I just wish I could change what I did"

- "I fucking hate myself for that I'm so sorry . . . I just wish I could change that"

- "I'm sorry I just wanna die for that just tell [Mother] I know I made a mistake"

- "I promise you that that you'll never get hurt again I know I fucked up n I regret it, ugh i just want to disappeared or something"

¶13 Although Tiffany was initially skeptical of Torres's repentance, within a couple of days she began expressing romantic feelings to him. For example, she told him, "I just want you but idk if my mom would let anything with us happen again," and, "I don't want to lose you. You're all I want. I don't want anyone else." Tiffany also unsuccessfully tried to convince Mother to allow her to see Torres again. At trial, Tiffany

explained that although she "was super hurt" by what Torres had done to her at the park, she "was also really dumb and thought that [she] could give him another chance" because her "hormones were all over the place from having a baby and [she] just wanted to feel loved and [she] liked him a lot before it happened."

¶14    Finally, after just over a week of communicating via text, Tiffany broke things off with Torres:

> I've tried and tried and I can't keep fighting with my mom every night over this. She doesn't want me to be with someone who did what you did after going on 2 dates. There is nothing we can do. You can't take back what you did. Nothing will ever be able to fix this. I'm sorry. Idk what to tell you but it's just not gonna work. I'm not gonna ruin my relationship with my mom agin for a boy. I'm sorry.

Torres responded that he understood and stated, "I hate myself for what I did, n I know, I know I can't take it backn I know n it's okay." Nevertheless, the two continued to text each other until the police arrested Torres.[7]

*Trial and Motion for New Trial*

¶15    The State charged Torres with one count of rape, a first-degree felony. In addition to rape, the jury was instructed on five lesser-included offenses. As part of its case-in-chief, the State introduced select text messages between Torres and Tiffany, as well as testimony from, among others, Tiffany,

---

7. Torres and Tiffany exchanged approximately 1,300 text messages between January 31, 2017, and February 9, 2017.

Mother, the forensic scientist, and Nurse. That evidence is summarized above.

¶16 Trial Counsel's primary strategy was focused on arguing that the State failed to meet its "high, high burden" of reasonable doubt. He argued that although the text messages came from Torres's phone number, there was no evidence that Torres was the one sending them. He emphasized the lack of DNA evidence and provided the alternative theory that Tiffany, who had stayed out past her 9:00 p.m. curfew, used Torres as a "scapegoat" to avoid punishment. During cross-examination of Tiffany, Trial Counsel highlighted that Tiffany did not at any point honk the horn, attempt to flee the vehicle, or call 911 despite having access to her phone.

¶17 The jury found Torres guilty of rape. At Torres's scheduled sentencing hearing, the trial court deferred sentencing and raised, sua sponte, concerns that the jury had been improperly instructed on one of the lesser included offenses. The court appointed Torres new counsel (Post-trial Counsel). At a later hearing, the court also raised concerns about Trial Counsel's performance. Post-trial Counsel moved for a new trial on the ground of ineffective assistance of counsel. Specifically, Post-trial Counsel asserted that even though Trial Counsel had access to "hundreds of text messages between" Tiffany and Torres that were produced by the State during discovery, there were many messages that showed "friendly interactions" shortly after the encounter at the park that Trial Counsel did not introduce at trial. For example, Post-trial Counsel pointed to the following text exchange that took place on February 2, two days after the rape:

> [Torres:] I wish I could hold you in my arms one last time
>
> [Tiffany:] Same

[Torres:] Yeah you're special to me. When I'm with you I feel something is just right, I believe in you. I really like you, and I don't want to let you go

[Tiffany:] Same

. . . .

[Torres:] What you up to? Let me know if I start bugging you

[Tiffany:] I'm sitting here, you? And you're not going to. Let me know if I bug you.

And on the following day, Tiffany initiated a plan for them to see each other on Valentine's Day:

[Torres:] I miss you so much baby

[Tiffany:] I miss you

. . . .

[Tiffany:] What are you doing on valentines day?

[Torres:] Probably nothing just go to my brothers n might drink to feel better n you?

[Tiffany:] Oh ok. And nothing.

[Torres:] Yeahbut I wish I would spend it with you n how come your not going to do anything

[Tiffany:] Well I mean I was gonna see if you wanted to go to the movies with [some friends] maybe but idk?

[Torres:] Oh idk i you want me to I'll be glad

[Tiffany:] Well I do

[Torres:] Oh ok but how is your mom gonna take that?

[Tiffany:] I'll talk to her.

[Torres:] Oh ok just let me know what she says n I'll understand if she says no

[Tiffany:] She probably won't care if [my friend] is with me . . . And I'll pay

[Torres:] Oh ok n no your not I'm paying n just let me know what she says

[Tiffany:] Nooo . . . And ok

[Torres:] Yess n why do you want to pay? n okay

[Tiffany:] Because you paid all the other times. . . . And idk what else to get you.

Post-trial Counsel argued that these and other similar "friendly interactions" were "inconsistent with [Tiffany's] claims of rape" and that Trial Counsel rendered ineffective assistance by not introducing any of those messages at trial.

¶18 The trial court agreed and granted the motion for a new trial, finding "that the errors and impropriety in the trial had a substantial adverse effect upon the rights of Torres." The court also adopted several other theories of ineffective assistance of counsel that neither party had briefed. Specifically, it found that Trial Counsel's performance had been prejudicially deficient in the following respects: (1) "Failure to present a meaningful defense in light of the State's case and the serious nature of the allegations"; (2) "Failure to admit or seek for the admission of

the texts exchange between Torres and [Tiffany] to establish context of texts that were admitted including what Torres was apologizing for"; (3) "Failure to meaningfully cross-examine or impeach [Tiffany] with the content of the texts"; (4) "Failure to object to the State's use of the text messages including leading questions during examination, failing to confront the State's statements in opening and arguments in closing regarding the text messages and the reality of the context, actual language used and minimization of the volume and content of the texts as presented in trial"; (5) "Failure to question the plausibility of [Tiffany's] allegations about what happened"; and (6) "Failure to provide a cogent theory of the case regarding the occurrence of the intercourse/penetration; consent and lesser included offenses; identifying the inherent improbability of the allegations made by [Tiffany]."

¶19 Regarding the first category of deficient performance, the court based its conclusion that Trial Counsel had not presented a meaningful defense on the following facts:

> Prior to trial, the Court received no pre-trial motions or motions in limine from either side and made no pre-trial rulings on the evidence. At trial, [Trial Counsel] made a 2–3 minute opening argument, asked 44 cross-examination questions in total, presented no case for defense, and gave a 10 minute closing argument. There were no motions at the end of the State's case.

The court concluded that although it could "conceive of a sound trial strategy to not ask *all* relevant questions or present *all* possible evidence in defense, it belies logic that a reasonable strategy would include forgo asking *any* relevant questions or present *any* relevant evidence." Accordingly, citing *Menzies v. Galetka*, 2006 UT 81, ¶ 98, 150 P.3d 480, the court determined that Trial Counsel had constructively deprived Torres of the effective

assistance of counsel because he had failed "to subject the opposition's case to meaningful adversarial testing." *See infra* note 8.

¶20   Concerning categories (2) through (4) of deficient performance related to the text messages, the court noted that the State introduced 13 text messages between Torres and Tiffany that were sent before Torres picked her up on January 31 and 72 messages that took place between the time he dropped her off at her home and his arrest a little over a week later. The court stated that although these texts were not the sole evidence the State relied on, "they were used significantly in the State's case" and "were central to the State's opening, presentation of evidence and closing." After reviewing the approximately 1,300 text messages sent between January 31 and February 9, the court concluded that "there are numerous texts that would have been favorable to [Torres]" because "the total text communications are significantly different than what was presented to the jury about the post-park thoughts of [Tiffany]." It further noted that while the 72 texts the State relied on "indicated [Tiffany] was unhappy, hurt, wanted to give up and was potentially suicidal" and "showed [Tiffany] did not know what to do about the relationship and she was torn between the opinion of her mother and wanting to make the relationship with Torres work," "[t]he entire text conversation . . . paints a different light about [her] reactions after January 31, 2017." Specifically, the court summarized the texts that were potentially helpful to the defense as

> [Tiffany] initiating plans for Valentine's Day with Torres, her thoughts on . . . moving out together, getting married, being together as a couple, Torres being a father figure to [Tiffany's] new baby, [Tiffany] and Torres making plans to sneak out and see each other, [Tiffany] sending romantic pictures of her and Torres, [Tiffany] sending . . . pictures of

Torres and her baby, [Tiffany's] frustrations with school, the baby and her mother, and [Tiffany's] feelings of love and affection for Torres. There are also texts that question whether the dark place [Tiffany] is in is a response to what happened at the park or a response to the restrictions imposed by her mom, the difficulties of being a new mom, hormonal issues from giving birth and being back on birth control. [Tiffany's] texts also contain many mundane matters such as shopping, clothes and shoes, buying a puppy, homework, etc.

In light of this, the court determined "the texts in total to be a contrast to [Tiffany's] allegations and testimony that a violent, forceful rape which left her bruised and injured at the hands of Torres had just occurred prior to the 8 days of subsequent contact by text, facetime and phone calls."

¶21　Although the court did not "believe the State affirmatively misrepresented the 72 texts that were presented," it concluded that Trial Counsel's failure to seek admission of any of the more favorable texts in rebuttal resulted in "the State's case [being] unchallenged." Moreover, the court held, "There is no reasonable trial strategy that accounts for failure to admit the text conversations or cross-examining [Tiffany's] testimony both for what she said and how she subsequently acted" and "for failing to admit favorable evidence to the defense that has been provided by the State." Additionally, the court stated that Trial Counsel's failure to object to the State's leading questions during Tiffany's testimony permitted the State "to 'move the ball' significantly."

¶22　Regarding the fifth category of deficient performance, the court stated that although Trial Counsel cross-examined Tiffany regarding her failure to call 911, text Mother for help, or flee the vehicle, he did not address the "logistical, mechanical and even

physical problems" with the acts Tiffany had described on the stand. And, while "[i]t certainly could be a reasonable strategic decision to not cross [Tiffany] and to let her testimony stand as it was presented," the court concluded that "it would be unreasonable and not sound trial strategy to not cross her *and* not address or point out the problems in closing argument."

¶23    Lastly, concerning the sixth category of deficient performance, the court concluded that Trial Counsel's opening statement and closing argument "contradicted each other and provided no cogent defense theory." The court pointed to Trial Counsel's remark during closing argument about the absence of male DNA evidence "in the areas that would demonstrate rape," which contradicted his opening statement in which he conceded that a consensual sexual encounter had occurred. The court ruled that although "[a]djusting to change would not be considered ineffective assistance[,] . . . failure to defend in this manner is ineffective." Additionally, the court noted that Trial Counsel "only made passing reference to the lesser included offenses [without] any explanation as to what the jury should do with them." "In essence," the court concluded, "there was no defense presented in this case."

¶24    Turning to prejudice, the court applied the cumulative error doctrine and determined "that the compounding of each error described above . . . undermines the Court's confidence in the jury's verdict and that Torres received a fair trial."[8] It

_____

8. The trial court alternatively determined that it could presume prejudice because Trial Counsel's "[f]ailure to present a meaningful defense in light of the State's case and the serious nature of the allegations" constructively deprived Torres of the effective assistance of counsel. *See supra* ¶¶ 18–19. *See United States v. Cronic*, 466 U.S. 648, 659 (1984) ("[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights

(continued…)

reasoned that "[a]lthough the State had other evidence regarding the allegations at trial, the evidence hinged on [Tiffany's] complaint of the rape and the admissions made by Torres in the text conversations"—both of which the court had determined were tarnished by Trial Counsel's deficient performance—and "[n]one of the additional evidence stood alone and separate from this evidence." Referring to Nurse's testimony, the court stated that it, "like the rest of the State's case, was unchallenged on cross-examination and not countered with testimony, evidence or even argument in closing." The court stated that "[n]o reasonable trial strategy accounts for letting hickies be only referred to as bruises,[9] to identify that no bruises were found on [Tiffany's] arms or on her back where they would be expected based on her testimony of the force used and the confined conditions in the car and that vaginal injuries can occur from consensual sexual contact as well."

¶25 Having concluded that Trial Counsel performed deficiently in these several respects and that the cumulative

---

(…continued)

that makes the adversary process itself presumptively unreliable."); *Menzies v. Galetka*, 2006 UT 81, ¶¶ 98–99, 150 P.3d 480 ("A constructive denial of counsel occurs if counsel completely fails to subject the opposition's case to meaningful adversarial testing. . . . Constructive denials of counsel have also been found where, due to counsel's deficient performance, a proceeding itself is forfeited. A denial of the entire judicial proceeding itself, which [proceeding] a litigant wanted at the time and to which he had a right, demands a presumption of prejudice because the litigant has been entirely denied the adversary process.") (quotation simplified). Both sides agree that this determination was in error, and we do not address it further.

9. Torres concedes that the court's statement concerning hickies being consistently equated to bruises has no basis in the record.

effect of those errors prejudiced Torres, the court granted Post-trial Counsel's motion for a new trial. The State appeals.

ISSUE AND STANDARDS OF REVIEW

¶26 The State argues that the trial court erred in granting Torres a new trial on the ground of ineffective assistance of counsel. Ordinarily, we review a court's ruling on a motion for a new trial for an abuse of discretion. *State v. J.A.L.*, 2011 UT 27, ¶ 20, 262 P.3d 1. *See also State v. De La Rosa*, 2019 UT App 110, ¶ 4, 445 P.3d 955 (stating that the abuse of discretion standard is "highly deferential to the trial court's ruling in that we assume that the district court exercised proper discretion unless the record clearly shows the contrary") (quotation simplified). But when a defendant moves for a new trial on ineffective assistance of counsel grounds, we apply the standard of review set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See J.A.L.*, 2011 UT 27, ¶ 20 ("An ineffective assistance of counsel claim is a mixed question of law and fact."); *State v. Templin*, 805 P.2d 182, 185–86 (Utah 1990) ("There is no reason . . . to depart from the standard of review set out in *Strickland* simply because the appeal was preceded by a motion for new trial."). Specifically, "ineffective assistance of counsel claims present a mixed question of fact and law." *Templin*, 805 P.2d at 186 (citing *Strickland*, 466 U.S. at 698). We review a trial court's application of the law to the facts for correctness and, if applicable, we review the court's findings of fact for clear error.[10] *See J.A.L.*, 2011 UT 27, ¶ 20.

---

10. Regarding our treatment of the prejudice prong of the *Strickland* test in the context of a trial court's grant of a new trial, we note that this approach represents a departure from the general "recognition that trial courts are in an advantaged position to that of appellate courts to determine the impact of events occurring in the courtroom on the total proceedings,"

(continued…)

(…continued)

resulting in a more deferential review. *State v. De La Rosa*, 2019 UT App 110, ¶ 5, 445 P.3d 955 (quotation simplified). *See Doug Jessop Constr., Inc. v. Anderton*, 2008 UT App 348, ¶ 15, 195 P.3d 493 ("A trial judge is in the best position to derive a sense of the proceeding as a whole, something an appellate court cannot hope to garner from a cold record.") (quotation simplified). But in the ineffective assistance of counsel context, our Supreme Court has held that "the trial court's direct observations do not generally play a role in determining whether a defendant received effective assistance of counsel and that it is unnecessary to grant deference to the district court in the minority of cases where an ineffective assistance of counsel claim is first raised before that court." *Menzies v. Galetka*, 2006 UT 81, ¶ 58, 150 P.3d 480. While perplexing at some level—a matter more fully explored in Judge Harris's fine concurring opinion—this approach is consistent with that taken in several other jurisdictions. *See, e.g.*, *People v. O'Hearn*, 270 Cal. Rptr. 3d 901, 913 (Ct. App. 2020) ("Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. Therefore, as to both performance and prejudice, we owe the trial court no deference.") (quotation simplified); *Stephens v. State*, 748 So. 2d 1028, 1034 (Fla. 1999) ("The second prong of the ineffective assistance of counsel test focuses on the reliability of the proceeding and has never been subject to an abuse of discretion standard of review[.]"); *State v. Carter*, 781 N.W.2d 527, 538 (Wis. Ct. App. 2010) ("[T]he determination of deficient performance and prejudice are questions of law that we review without deference to the trial court."). *But see State v. Waitkus*, 778 P.2d 1283, 1285 (Ariz. Ct. App. 1989) ("We accord great deference to the trial court's finding of lack of prejudice in ineffective assistance of counsel cases."); *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999) ("Although the prejudice prong of *Strickland* is a mixed question of law and fact, that question often contains subsidiary questions of historical fact,

(continued…)

ANALYSIS

¶27　A claim of ineffective assistance of counsel requires a criminal defendant to show both that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (quotation simplified).

¶28　To establish deficient performance, the defendant must show that trial counsel's actions "fell below an objective standard of reasonableness," which entails overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688–89. Indeed, "even if an [act or] omission is inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (quotation simplified). Instead, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶29　To establish prejudice, the "defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (quotation simplified). "A reasonable

---

(…continued)
some of which may turn upon the credibility and demeanor of witnesses. Appellate courts must afford almost total deference to a trial court's determination of the historical facts and of mixed questions of law and fact that turn on an evaluation of credibility and demeanor.") (quotation simplified).

probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In determining prejudice, "an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Gregg v. State*, 2012 UT 32, ¶ 21, 279 P.3d 396 (quotation simplified). *See State v. Lopez*, 2019 UT App 11, ¶ 35, 438 P.3d 950 (holding that based on the "overwhelming evidence . . . introduced at trial," there was "no reasonable probability that," absent the error, the outcome would have been more favorable to the defendant); *State v. King*, 2010 UT App 396, ¶ 35, 248 P.3d 984 ("While we more readily find errors to be harmless when confronted with overwhelming evidence of the defendant's guilt, we are more willing to reverse when a conviction is based on comparatively thin evidence.") (internal citations omitted).

## I. Text Messages

¶30 The trial court ruled that Trial Counsel's performance was deficient because he did not introduce the text messages that the court determined "in total to be a contrast to [Tiffany's] allegations and testimony that a violent, forceful rape which left her bruised and injured at the hands of Torres had just occurred prior to the 8 days of subsequent contact by text, facetime and phone calls." Relatedly, the court also held that Trial Counsel had performed deficiently in failing "to meaningfully cross-examine or impeach [Tiffany] with the content of [the] texts" and "failing to confront the State's statements in opening and arguments in closing regarding the text messages and the reality of the context, actual language used and minimization of the volume and content of the texts as presented in trial." But even assuming, without deciding, that Trial Counsel performed deficiently in these respects, these claims fail for lack of

prejudice.[11] *See State v. Galindo*, 2017 UT App 117, ¶ 7, 402 P.3d 8 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.") (quotation simplified).

¶31 In determining that Torres was prejudiced, the trial court concluded that none of the additional evidence the State presented "stood alone and separate from" Tiffany's testimony and the admitted text messages. This analysis focused mainly on Nurse's testimony. Although recognizing that the testimony and documented injuries "certainly are corroborating evidence of rape," the court stated that the testimony "was unchallenged on cross-examination and not countered with testimony, evidence or even argument in closing." Specifically, "potential issues . . . were left unexplored," such as the lack of bruises on Tiffany's arms or back "where they would be expected based on her testimony of the force used and the confined conditions in the car," and that "vaginal injuries can occur from consensual sexual contact as well." We disagree with the court's analysis.

---

11. The trial court determined that the cumulative effect of all the errors "undermine[d its] confidence in the jury's verdict and that Torres received a fair trial." *See State v. Maestas*, 2012 UT App 53, ¶ 18, 272 P.3d 769. We conclude that the cumulative error doctrine does not apply to this case because Trial Counsel did not perform deficiently in two of the three non-text-related instances discussed in section II below, and we hold that the remaining non-text-related instance, "standing alone, has [no] conceivable potential for harm." *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038. Accordingly, there is no other error with which to cumulate Trial Counsel's presumed text-related errors—which, as we determine *infra*, do not undermine our confidence in the outcome of the trial—and the cumulative error doctrine therefore does not apply.

¶32  As an initial matter, the jury was aware that Tiffany continued to speak with Torres and even to express affection for him following the events of January 31. To provide context for the text messages that were admitted, the State did include certain favorable messages from Tiffany to Torres, including these three:

- [Tiffany:] I know. . I just want you but idk if my mom would let anything with us happen again.

- [Tiffany:] I don't want to lose you. You're all I want. I don't want anyone else. But idk.

- [Tiffany:] Yeah but the thing is if my mom doesn't want me with you I can't be with you. I love you and want you a lot but I can't disrespect my mom. . . .

The State also introduced several text messages in which Tiffany told Torres that she was trying to convince Mother to allow them to keep seeing each other. Additionally, the State told the jurors in its opening statement that they would see some texts between Tiffany and Torres that would show that "a part of [Tiffany] wanted things to go back to the way they were before [Torres] raped her" and that she "thought that they could still make [their relationship] work." And during her testimony, Tiffany explained that she "thought that [she] could give [Torres] another chance" because her "hormones were all over the place from having a baby and [she] just wanted to feel loved and [she] liked him a lot before it happened."

¶33  Accordingly, although the jury might not have known the full extent to which Tiffany expressed affection for Torres following the rape, it was nonetheless aware that Tiffany had continued to communicate with Torres and wished, at least at first, to continue her relationship with him following the events of January 31. In light of this, our review of the record leads us to conclude that Trial Counsel's decision not to seek the admission

of additional favorable texts or to challenge statements the State made in reference to the texts during opening and closing did not materially affect the entire evidentiary picture.[12] *See Gregg v. State*, 2012 UT 32, ¶ 21, 279 P.3d 396.

¶34 Ample additional evidence supported Torres's conviction, including, most notably, the texted admissions he made in the week following the rape and Nurse's testimony regarding her physical examination of Tiffany. Concerning the former, Torres repeatedly apologized for forcing Tiffany to have sex and swore it would never happen again. *See supra* ¶¶ 11–12. Torres contends that "the texts the State portrays as confessions are ambiguous . . . because they are paired with [Torres's] surprised, 'What do you mean?,' and his statements, 'but I saw that you wanted too' and 'but I didn't know.'" We agree that certain of Torres's statements could be subject to more than one interpretation. But not so with others. Most notably, when, with our emphasis, Tiffany unambiguously confronted Torres the next day, "How am I supposed to let someone who *forced me to*

---

12. Moreover, Tiffany's expressions of affection toward Torres do not necessarily cut only in Torres's favor. Even the "friendly" texts are not necessarily inconsistent with rape. Utah courts have recognized "that rape victims display a diverse range of reactions to the harm they suffered," *State v. Jok*, 2019 UT App 138, ¶ 24, 449 P.3d 610, *cert. granted*, 456 P.3d 386 (Utah 2019), and that "not all rape victims will . . . have no further interaction with their rapists," *State v. Nunes*, 2020 UT App 145, ¶ 30 n.12, 476 P.3d 172. Furthermore, Trial Counsel argued at trial that Tiffany used Torres as a "scapegoat" to avoid punishment for staying out past curfew. The admission of additional friendly texts could have possibly undermined this theory because a jury, upon reading Tiffany's texts to Torres, might disbelieve that she would use someone of whom she was so fond as a scapegoat just to avoid parental discipline, given how serious the repercussions would be for Torres.

*have sex* fix it. How are you supposed to fix that," Torres responded, "I'm so sorry for that I didn't mean to, n I don't know, I just wish there was I way." Such an admission clearly supported the jury's verdict.

¶35 Finally, Nurse's examination and trial testimony were particularly damaging to Torres's defense as they provided strong evidence in support of Tiffany's rape allegation. The trial court discounted Nurse's testimony on the ground that Trial Counsel failed to elicit testimony from Nurse "that vaginal injuries can occur from consensual sexual contact as well." But while that might generally be true, Nurse testified that Tiffany's genital exam revealed some of the most severe injuries she had seen in her 12-year career. Furthermore, Nurse concluded that "several different motions" caused the injuries and the number of injuries suggested non-consensual sex because in "consensual experiences, typically you would readjust or change something if something was uncomfortable or hurt you" and the "several sites of injury here indicate that there's not a correction to prevent injury." Had Trial Counsel asked whether Tiffany's injuries could have resulted from consensual sex, Nurse would presumably have repeated this point.[13]

¶36 In sum, because the jury was already aware of the "friendly" post-rape interaction between Torres and Tiffany, and because Tiffany's allegation of rape was supported by strong

---

13. The trial court also discounted Nurse's testimony on the ground that Trial Counsel failed "to identify that no bruises were found on [Tiffany's] arms or on her back where they would be expected based on her testimony of the force used." This, however, does not undermine the compelling physical evidence discussed above that was consistent with Tiffany's account that the sexual encounter was forcible and nonconsensual, and does not discount the evidence of bruises elsewhere on Tiffany's body.

physical evidence and texts in which Torres apologized to Tiffany after she unambiguously accused him of "forc[ing her] to have sex," we conclude that Trial Counsel's perceived error in not seeking to admit more of the "friendly" text messages did not prejudice Torres.[14]

## II. Remaining Claims of Ineffective Assistance

¶37 The trial court also ruled that Trial Counsel rendered ineffective assistance in three instances that were unrelated to the text message exchanges: (1) "[f]ailure to question the plausibility of [Tiffany's] allegations about what happened,"

---

14. Relatedly, the trial court also determined that Trial Counsel performed deficiently by failing "to object to the State's use of the text messages including leading questions during examination" of Tiffany. Our review of this ground of ineffective assistance is limited because the court never identified the specific questions to which Trial Counsel should have objected. With this in mind, even assuming deficient performance in this general respect, any assumed error was not prejudicial because any objection would have been toward the form and not the substance of the question. The State would have then presumably been given the opportunity to rephrase its questions and present the substance of the text messages to the jury using non-leading questions.

Torres argues that although "[t]he language of the [text messages] might have come in," the record is unclear as to "how the prosecutor's tone of voice [while reading the messages aloud] impacted the jury." While the trial court determined that the prosecutor's use of leading questions was problematic because it allowed him "to 'move the ball' significantly," it did not determine that the prosecutor's tone of voice negatively impacted the jury. Furthermore, Torres's argument is unavailing because "[s]uch speculation is insufficient to demonstrate prejudice." *See State v. Hards*, 2015 UT App 42, ¶ 22, 345 P.3d 769.

(2) failure "to provide a cogent theory of the case regarding the occurrence of the intercourse/penetration," and (3) "failure to address the lesser included offenses." We address each in turn and conclude that they do not amount to ineffective assistance.

¶38 Concerning Trial Counsel's failure to challenge the plausibility of Tiffany's allegations, the court stated that "[t]he very acts described by [Tiffany] . . . had logistical, mechanical and even physical problems that were not explained or explored while she was on the stand" or discussed during Trial Counsel's closing arguments. The court did not identify the specific "logistical, mechanical, and . . . physical problems" to which it referred, but later, in discussing Nurse's testimony in the context of prejudice, the court stated that "no bruises were found on [Tiffany's] arms or on her back where they would be expected based on her testimony of the force used." Accordingly, we limit our analysis to this contention.

¶39 Even assuming, without deciding, that Trial Counsel performed deficiently in this regard, such an omission did not prejudice Torres. As discussed above, strong physical evidence supported Tiffany's version of events. Nurse testified that bruising to Tiffany's legs was consistent with her account of being pulled from the passenger seat to the driver seat and hitting up against objects during the ensuing struggle. More importantly, Nurse testified regarding the number and seriousness of the injuries Tiffany suffered to her genital area that were caused by "several different motions," which was highly indicative of non-consensual sex. The court's belief that Tiffany should also have sustained bruising to her arms and back, on the other hand, was no more than speculation unsupported by record evidence. Indeed, had Trial Counsel asked Nurse about the apparent lack of bruising in some areas, it is unclear whether Nurse would have confirmed that the absence was unusual or merely stated that it was inconclusive. Accordingly, Trial Counsel's perceived failure to point out or

inquire into the absence of bruising on Tiffany's arms and back was not prejudicial. *See State v. Von Niederhausern*, 2018 UT App 149, ¶ 30, 427 P.3d 1277 ("Proof of prejudice must be based on a demonstrable reality and not a speculative matter.") (quotation simplified).

¶40 Next, the trial court determined that Trial Counsel performed deficiently by failing "to provide a cogent theory of the case regarding the occurrence of the intercourse/penetration." Specifically, the court pointed to Trial Counsel's seemingly contradictory comments made during his opening statement and closing argument. During his opening statement, Trial Counsel conceded that Tiffany and Torres had engaged in sex, albeit consensually. But during closing argument, Trial Counsel pointed to the fact that no DNA evidence was found "in the areas that would demonstrate rape." Although acknowledging that "trials are dynamic and changes occur often" and that "[a]djusting to change would not be considered ineffective assistance," the court simply concluded that "failure to defend in this manner is ineffective," without providing further explanation.

¶41 The court incorrectly stated that Trial Counsel limited the argument concerning the lack of male DNA evidence to his closing argument—he also pointed to the paucity of DNA evidence during his opening statement, following which he stated that Tiffany and Torres engaged in consensual sex that night. Furthermore, the two statements are not necessarily inconsistent. Trial Counsel did not specify the form of sex in which the two engaged. In context, Trial Counsel was likely referring to the oral sex Tiffany testified to briefly performing on Torres prior to the rape or even the kissing and sucking that likely resulted in at least some of the bruising on Tiffany's chest, neither of which would have resulted in Torres's DNA being transferred to Tiffany's genital area. Thus, while acknowledging that sexual activity did occur that night, given that the rape

allegation involved vaginal penetration Trial Counsel emphasized the lack of DNA evidence because it did not support the penetration allegation.[15] Conversely, the lack of DNA evidence in the relevant areas might also suggest that the sexual encounter that admittedly did occur, which Torres asserted was consensual, did not culminate in ejaculation, perhaps because Torres was eventually responsive to Tiffany's request that he stop. In any event, Trial Counsel's concession that Tiffany and Torres engaged in sex that night and his emphasis on the lack of DNA evidence were not "objectively unreasonable" and therefore did not amount to deficient performance. *See State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶42 Lastly, concerning the "failure to address the lesser included offenses," the court faulted Trial Counsel for "only ma[king] passing reference to the [five] lesser included offenses [without] any explanation as to what the jury should do with them." We conclude that Trial Counsel did not perform deficiently in this regard.

¶43 Apparently having concluded that the instructions spoke for themselves, Trial Counsel told the jury during closing, "I'm not going to go over the instructions, the elements. You guys can read." A competent attorney, having determined that the instructions were clear on their face—which determination has not been challenged as untenable[16]—could certainly choose to

_____

15. To be sure, strong evidence of vaginal rape existed in the form of Nurse's examination and testimony regarding the number and seriousness of the injuries to the genital area. But it was not objectively unreasonable for Trial Counsel to cast doubt on the allegation in whatever manner was available.

16. Although the trial court initially expressed concern regarding one of the lesser-included-offense instructions, Torres did not seek a new trial on this ground, and the court did not address

(continued…)

omit a lengthy discussion of the elements of five offenses for the sake of brevity or to focus the jury's attention on other aspects of the case. Such a decision is certainly defense counsel's prerogative. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("[J]udicious selection of arguments for summation is a core exercise of defense counsel's discretion."); *id.* at 7 ("Focusing on a small number of key points may be more persuasive than a shotgun approach."). Accordingly, it cannot be said that Trial Counsel's election not to discuss the lesser-included-offense instructions during closing was "objectively unreasonable." *See Scott*, 2020 UT 13, ¶ 36.

## CONCLUSION

¶44 Reviewing the trial court's ineffective assistance of counsel decision nondeferentially, we conclude that Torres was not deprived of the effective assistance of counsel. Notably, Trial Counsel's decision not to introduce the additional favorable post-rape text exchanges between Tiffany and Torres was not prejudicial because the jury was already aware of their attempted reconciliation and expressions of affection toward each other and because other strong evidence supported the jury's verdict. The trial court also erred in concluding that Trial Counsel rendered ineffective assistance in the remaining non-text-related instances that it addressed in its order. Accordingly, we set aside the trial court's grant of a new trial and remand for the entry of conviction on the verdict returned by the jury and for sentencing.

————————

(…continued)
this issue in its order granting a new trial. And on appeal, there is no claim that the jury instructions on the lesser-included offenses were not proper.

HARRIS, Judge (concurring):

¶45   We are asked to assess claims of ineffective assistance of counsel on a regular basis. Pursuant to Utah's pattern and practice, in the vast majority of cases—at least on direct appeal—such claims are brought to us in the first instance, and there is no lower court decision on the matter for us to review. *See, e.g.*, *Menzies v. Galetka*, 2006 UT 81, ¶ 58, 150 P.3d 480 ("Ineffective assistance of counsel claims are a unique species of claim that are frequently raised for the first time on appeal and are regularly decided based on the record."). In those cases, we often state that, "when a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *See, e.g.*, *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

¶46   But on occasion, we are asked to review, on direct appeal, ineffective assistance claims that have already been considered by a trial court, usually in the context of a motion for new trial filed by a defendant's newly hired post-trial counsel. *See, e.g.*, *Menzies*, 2006 UT 81, ¶¶ 4, 56–58; *State v. Templin*, 805 P.2d 182, 185–86 (Utah 1990). The case before us today comes to us in this less-typical procedural posture. And in these cases, our supreme court has instructed us to review the trial court's decision nondeferentially. *See Menzies*, 2006 UT 81, ¶ 58 (stating that "it is unnecessary to grant deference to the district court in the minority of cases where an ineffective assistance of counsel claim is first raised before that court"); *see also supra* ¶ 26. We are, of course, bound to follow the pronouncements of our supreme court, and therefore we must apply a nondeferential standard of review in assessing the propriety of the court's decision to grant Torres's motion for new trial. And applying that standard of review, I fully concur in the well-reasoned analysis of the lead opinion.

¶47 But in this case, my vote might well have been different had we applied a more deferential standard of review, as we often do in cases where the same trial judge who presided over a trial made a decision on a motion for new trial. *See Sanpete Am., LLC v. Willardsen*, 2011 UT 48, ¶¶ 28–29, 269 P.3d 118 (stating that "we afford trial judges wide latitude in granting or denying" motions for new trial "because the trial court, having heard the evidence, typically is in a better position to determine whether the grant or denial of a [motion for new trial] is warranted," but declining to extend the same deference to rulings made by a "successor judge" who "did not preside over trial"). In criminal cases, trial courts are given discretion to "grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." *See* Utah R. Crim. P. 24(a). And as a general matter, "this standard is highly deferential to the trial court's ruling," and appellate courts are to "assume that the [trial] court exercised proper discretion unless the record clearly shows the contrary." *See State v. De La Rosa*, 2019 UT App 110, ¶ 4, 445 P.3d 955 (quotation simplified). The reasons for applying a deferential standard of review in such cases are relatively obvious: judges asked to rule on motions for a new trial regarding trials over which they presided "are in an advantaged position to that of appellate courts to determine the impact of events occurring in the courtroom on the total proceedings." *See id.* ¶ 5 (quotation simplified). There is simply no jurist better positioned to assess whether "the interest of justice" requires a new trial, and whether a trial error or impropriety has caused a "substantial adverse effect" on the defendant's rights, *see* Utah R. Crim. P. 24(a), than the jurist who just finished personally observing the entire warp and weft of trial.

¶48 To succeed on a claim of ineffective assistance, a defendant must demonstrate both that his attorney performed deficiently and that the attorney's deficient performance was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 698. As explained in *Sawyer v. Department of Workforce Services*, 2015 UT 33, 345 P.3d 1253, Utah law "envision[s] multiple standards of review for various types of mixed questions, occupying a spectrum of deference falling between the nondeferential de novo standard of review and the highly deferential clearly erroneous standard of review." *See id.* ¶ 9. In our supreme court's "more recent cases," it has "applied a binary method for determining the standard of review for mixed questions," depending on whether the particular mixed question presented "is properly characterized as either law-like or fact-like." *Id.* ¶ 11. "Law-like mixed questions are reviewed de novo, while fact-like mixed questions are reviewed deferentially." *Id.* "In determining whether a mixed question should be deemed law-like or fact-like," Utah appellate courts "evaluate the marginal costs and benefits of conducting either a searching de novo review or a deferential review of a lower tribunal's resolution of the mixed question." *Id.* ¶ 12 (quotation simplified). "This cost-benefit analysis is conducted through [a] three-factor" test, first articulated in *State v. Levin*, 2006 UT 50, 144 P.3d 1096. *See Sawyer*, 2015 UT 33, ¶ 12.

¶49    In *Menzies v. Galetka*, 2006 UT 81, 150 P.3d 480, our supreme court applied the *Levin* test to trial court decisions regarding ineffective assistance of counsel. *See id.* ¶¶ 56–58. However, the *Menzies* court did not engage in the inquiry used in the court's more recent cases, as recognized in *Sawyer*: an examination of whether the particular mixed questions at issue are more law-like or more fact-like. *Compare id., with Sawyer*, 2015 UT 33, ¶¶ 11–14. Indeed, in my view, the court's analysis in *Menzies* was rather cursory, containing no examination of the individual components of the *Strickland* test, and concluding simply that ineffective assistance claims "are regularly decided based on the record" and that appellate courts therefore "do not

defer to the district court's ultimate legal decision." *See Menzies*, 2006 UT 81, ¶ 58.

¶50   To be clear, I have no issue with application of a nondeferential standard of review with regard to a trial court's decision on the first *Strickland* prong: deficient performance. After all, deficient performance is an objective inquiry that asks, first and foremost, whether the attorney acted reasonably. *See State v. Ray*, 2020 UT 12, ¶ 33, 469 P.3d 871 ("[T]he ultimate question is not whether counsel's course of conduct was strategic, but whether it fell below an objective standard of reasonableness."). An appellate court is just as well-positioned as a trial court to determine whether "a common set of recurring . . . practices qualifies as . . . 'reasonable.'" *See In re adoption of Baby B.*, 2012 UT 35, ¶ 44, 308 P.3d 382. Accordingly, "a mixed finding of reasonableness is typically subject to a non-deferential standard of review," because it is more law-like than fact-like and lends itself "to consistent resolution by uniform precedent." *See id.*

¶51   But in my view the calculus changes for the second *Strickland* prong: prejudice. Like the majority, *see supra* note 10, I find it "perplexing" that we are instructed not to defer to trial court determinations regarding prejudice in this specific context—at least where the same judge who presided over the trial made the prejudice determination—and I wonder whether our law ought to develop a standard of review in ineffective assistance of counsel cases that requires some level of deference to such determinations—that is, to a trial court's determination that there is (or is not) a reasonable probability that the outcome of the trial would have been different had counsel not performed deficiently, *see Strickland*, 466 U.S. at 694. To my eye, the prejudice inquiry seems a lot more fact-like than law-like; indeed, the prejudice inquiry is often extremely fact-bound and may not lend itself well to "consistent resolution by a uniform body of appellate precedent." *See In re adoption of Baby B.*, 2012

UT 35, ¶ 42 (quotation simplified); *cf. Salve Regina College v. Russell*, 499 U.S. 225, 233 (1991) (explaining that "deferential review of mixed questions of law and fact is warranted when it appears that the district court is better positioned than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine" (quotation simplified)). And in cases like this one, where the judge making the prejudice determination presided over the trial, there is good reason to defer to a trial court's judgment on the topic of prejudice in particular: trial judges "are in an advantaged position to that of appellate courts to determine the impact of events occurring in the courtroom on the total proceedings." *See De La Rosa*, 2019 UT App 110, ¶ 5 (quotation simplified). And we are not the only ones who have made that rather intuitive observation. *See, e.g.*, *Francis v. State*, 529 So. 2d 670, 673 n.9 (Fla. 1989) (observing that the judge who heard the post-trial ineffective assistance claim also presided over the trial, and posing the rhetorical question, "Who, better than he, could determine whether failure to introduce this evidence prejudiced [the defendant] sufficiently to meet the *Strickland v. Washington* test?").

¶52 In other similar contexts, Utah appellate courts are instructed to give great deference to a trial court's determination as to whether an impropriety that occurred during trial was prejudicial. In the context of rule 24(a) motions for new trial, we recently recognized that the "substantial adverse effect" inquiry is one that "falls entirely within the discretion of the trial court due to its advantaged position to judge the impact of legal errors on the total proceedings." *See De La Rosa*, 2019 UT App 110, ¶ 9 (quotation simplified).[17] And in a related context regarding

---

17. Indeed, the authority of trial courts to grant a new trial when they perceive that injustice has occurred in a trial over which they presided—as set out in today's rule 24 of the Utah Rules of

(continued…)

motions for mistrial—which are governed by a similar standard, under which courts are instructed to grant motions for mistrial only if "a fair trial cannot be had and . . . a mistrial is necessary to avoid injustice," *see State v. Whytock*, 2020 UT App 107, ¶ 16, 469 P.3d 1150 (quotation simplified)—trial courts are afforded great discretion in determining whether a trial issue caused a problem big enough to warrant retrying the case. *See State v. Maestas*, 2012 UT 46, ¶ 325, 299 P.3d 892 (stating that "trial courts have discretion in granting or denying a motion for a mistrial . . . because of the[ir] advantaged position . . . to determine the impact of events occurring in the courtroom on the total proceedings" (quotation simplified)). Similarly, our supreme court has determined that a trial court is entitled to at least some deference in ruling on whether a defendant's Sixth Amendment right to a fair trial was violated. *See State v. Daniels*, 2002 UT 2,

---

(…continued)

Criminal Procedure—dates back centuries, to the English common law. *See* Albert D. Brault & John A. Lynch, Jr., *The Motion for New Trial and Its Constitutional Tension*, 28 U. Balt. L. Rev. 1, 3 (1998) (noting that, under English common law, a trial judge's authority to grant a new trial was considered "the principal method of correcting errors at trial"); *see also Capital Traction Co. v. Hof*, 174 U.S. 1, 13–14 (1899) (stating that "trial by jury . . . is not merely a trial by a jury of twelve" but is conducted "in the presence and under the superintendence of a judge empowered . . . to set aside their verdict, if, in [the judge's] opinion, it is against the law or the evidence" (quotation simplified)). And in those early days, a trial court's determination to grant a new trial was considered final and unreviewable. *See, e.g.*, *Newcomb v. Wood*, 97 U.S. 581, 583–84 (1878) ("It has long been the established law in the courts of the United States that to grant or refuse a new trial rests in the sound discretion of the court to which the motion is addressed, and that the result cannot be made the subject of review upon a writ of error.").

¶ 19, 40 P.3d 611 (stating that, "[d]ue to the fact-dependent nature of" the question regarding the fairness of the trial, "we afford the trial court a measure of deference in its application of the law to the facts of this case"). And even evidentiary decisions made pursuant to rule 403 of the Utah Rules of Evidence—in which trial courts are asked to weigh the risks of unfair trial prejudice against a piece of evidence's probative value—are reviewed for abuse of discretion. *See Arnold v. Grigsby*, 2018 UT 14, ¶ 25 n.5, 417 P.3d 606 ("'In reviewing a trial court's ruling on the admissibility of evidence under rule 403, we will not overturn the court's determination unless it was an abuse of discretion. To state the matter more precisely, we review the trial court's 403 ruling admitting or denying admission to evidence by deciding whether . . . the trial court's decision . . . was beyond the limits of reasonability.'" (quoting *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992)).

¶53 In ineffective assistance of counsel cases, other jurisdictions have developed a standard of review that gives deference to a trial court's prejudice determination, *see, e.g., State v. Waitkus*, 778 P.2d 1283, 1285 (Ariz. Ct. App. 1989) ("We accord great deference to the trial court's finding of lack of prejudice in ineffective assistance of counsel cases."), especially where the ineffective assistance claim is adjudicated by the same judge who presided over the trial, *see, e.g., Rossetti v. United States*, 773 F.3d 322, 327 & n.3 (1st Cir. 2014) (noting that "[t]he district judge who heard Rossetti's [ineffective assistance] petition also presided over his trial and so was in a good position to assess Rossetti's claims," and therefore reviewing the district court's prejudice determination "largely for clear error"); *Ex parte Gissendanner*, 288 So. 3d 1011, 1028–29 (Ala. 2019) (concluding that the intermediate appellate court erred "in failing to give [the trial judge's] findings of prejudicial ineffective assistance of counsel considerable weight, since he presided over both [the] original trial and the [ineffective assistance] proceedings" (quotation simplified)); *Francis*, 529 So. 2d at 673 n.9 (quoted

above).[18] And in my view, these other jurisdictions have it right, at least where the judge making the prejudice determination also presided over the trial: in that circumstance, a court's determination regarding prejudice is worthy of a certain level of deference. *Cf. Willardsen*, 2011 UT 48, ¶¶ 28–29 (acknowledging that a decision regarding a motion for new trial made by the judge who presided over the trial is entitled to more deference than a similar decision made by a "successor judge" who did not preside over the trial). I simply disagree—at least as to the prejudice prong—with our supreme court's statement in *Menzies* that a "trial court's direct observations do not generally play a role in determining whether a defendant received effective assistance of counsel." *See* 2006 UT 81, ¶ 58.

¶54    In this case, as we review this matter based on the cold record, it appears to us as though the alleged mistakes made by Trial Counsel were not significant enough to have changed the outcome of the trial. As the lead opinion ably points out, the jury was already aware of the general tenor of the text messages, and the record presented to us gives us little reason to be confident that information regarding additional friendly texts from Tiffany

---

18. I acknowledge that several other jurisdictions have developed standards of review in which no deference is given to lower court determinations of prejudice in ineffective assistance cases. *See, e.g.*, *Taylor v. Commissioner of Corr.*, 153 A.3d 1264, 1270 (Conn. 2017) ("The application of historical facts to questions of law that is necessary to determine whether the petitioner has demonstrated prejudice under *Strickland v. Washington*, . . . however, is a mixed question of law and fact subject to our plenary review."). However, in many of these jurisdictions, ineffective assistance claims are often raised in post-conviction proceedings before a different judge than the one who heard the trial, and the reasons for deference wane considerably when the judge who makes the prejudice determination is not the same judge who presided over the trial. *See, e.g., id.* at 1268–69.

to Torres would have changed the outcome of the trial, especially given Tiffany's testimony, Nurse's testimony, and (most significantly, in my view) Torres's texts acknowledging—or at least not contesting—that he forced Tiffany to have sex.

¶55    But even in the face of this evidence, the trial court was unquestionably troubled by the way in which the trial unfolded, and took several steps in an attempt to rectify what it saw as a series of problems in Torres's defense. The trial court, without being asked, raised questions about potential problems with the jury instructions and appointed Post-trial Counsel to look into the matter. Later, again without being asked, the court raised concerns about the effectiveness of Trial Counsel's performance. Then, after Post-trial Counsel filed a motion seeking a new trial, the court not only granted that motion but identified, in its written decision, several additional issues with Trial Counsel's performance that Post-trial Counsel had not yet raised. These are significant (and rather unusual) steps for a court to take, and I am left wondering whether there might be something not contained in the appellate record—for instance, matters of perception that a judge presiding over the trial might have better understood than we are able to—that motivated the court's actions.

¶56    In the big picture, I think we want to encourage—rather than discourage—trial judges to speak up when they perceive a problem with the manner in which a trial has unfolded. I commend the trial judge in this case for speaking up when she saw something she perceived as concerning. I hope our conclusion in this case does not deter trial judges from doing so in the future. And in an ideal world we would afford such decisions some level of deference, at least as concerns a determination that the identified problems would have made a difference to the outcome of the trial.

––––––––––